_____

No. 24-1626
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT
_____

TEXAS ALLIANCE OF ENERGY PRODUCERS and
DOMESTIC ENERGY PRODUCERS ALLIANCE,

Petitioners,

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

Respondent,

DISTRICT OF COLUMBIA, ET AL.

Intervenors.
_____

Petition for Review of an Order of the Securities & Exchange
Commission
_____

**PETITIONERS' OPENING BRIEF**
_____

RACHEL K. PAULOSE
  Pacific Legal Foundation
  3100 Clarendon Blvd., Ste. 1000
  Arlington, VA 22201
  Telephone: (202) 465-8734
  Facsimile: (916) 419-7747
  RPaulose@pacificlegal.org

LUKE A. WAKE
  Pacific Legal Foundation
  555 Capitol Mall, Ste. 1290
  Sacramento, CA 95814
  Telephone: (916) 419-7111
  Facsimile: (916) 419-7747
  LWake@pacificlegal.org

*Counsel for Petitioners*

# SUMMARY OF THE CASE

This case asks whether the Securities and Exchange Commission ("Commission") has authority to promulgate rules requiring public companies to make climate change related disclosures. And if so, whether the Commission's delegated rulemaking authority violates the nondelegation doctrine. Oral argument should be heard because of the complexity and importance of the issues presented. Petitioners submit that they need 30 minutes for oral argument.

Appellate Case: 24-1626    Page: 2    Date Filed: 06/21/2024 Entry ID: 5406004

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the Petitioners confirm that neither the Texas Alliance of Energy Producers nor the Domestic Energy Producers of America have any parent corporation and that no publicly held corporation owns 10% or more of their stock.

s/ Luke A. Wake
LUKE A. WAKE

*Counsel for Petitioners*
*Texas Alliance of Energy Producers*
*and*
*Domestic Energy Producers Alliance*

Appellate Case: 24-1626    Page: 3    Date Filed: 06/21/2024 Entry ID: 5406004

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE CASE ....................................................................i

CORPORATE DISCLOSURE STATEMENT .........................................ii

TABLE OF AUTHORITIES ................................................................v

STATEMENT OF JURISDICTION ........................................................1

STATEMENT OF THE ISSUES ..........................................................2

INTRODUCTION ............................................................................3

STATEMENT OF THE CASE .............................................................8

    A. The Commission's Climate Rule .............................................8

        1. Climate Change Governance Disclosures............................10

        2. Greenhouse Gas Emission Disclosures................................12

        3. Climate Change Risk Disclosures.......................................13

    B. The Commission's Claimed Authority ...................................14

    C. Injury to Texas Alliance and DEPA.......................................16

SUMMARY OF ARGUMENT ...........................................................19

ARGUMENT ................................................................................23

STANDARD OF REVIEW ................................................................23

I. The Climate Rule Compels Financially Irrelevant Disclosures .........25

II. The SEC Lacks Statutory Authority for the Climate Rule ..............29

    A. The Statutory Text Limits the Commission to Regulating Financially-Relevant Information ................................................29

        1. The Text Unambiguously Denies Climate-Change Disclosure Rulemaking Authority............................................30

            i. The Fact Congress Enumerated Only Financially Relevant Disclosures Confirms That the Commission Lacks Authority to Regulate Other Matters .........................33

            ii. Further Textual Confirmation That the Commission Has Limited Powers..............................................................42

Appellate Case: 24-1626    Page: 4    Date Filed: 06/21/2024   Entry ID: 5406004

    2. The Commission's Interpretation Unreasonably
       Transforms Its Authority into an Ungoverned and
       Limitless Power ........................................................................ 47

  B. The Major Questions Doctrine Forecloses the Commission's
    Claim to Long Unheralded Powers ............................................... 50

III. No Intelligible Principle Governs the Commission's Claimed
    Rulemaking Authority ................................................................... 56

  A. The Nondelegation Doctrine Requires Congress Must
    Limit and Channel Rulemaking Discretion ................................... 56

  B. There Is No Intelligible Principle Under the Commission's
    Interpretation of Its Powers ........................................................ 59

    1. If Unconstrained to Regulating Financially
       Relevant Matters, the Power to Make Rules in the
       "Public Interest" Is Limitless ................................................ 59

    2. If Unconstrained to Detering Misleading Statements,
       the Power To Make Rules "For the Protection of Investors"
       Is Limitless ........................................................................ 64

    3. *American Power & Light Co.* Is Easily Distinguishable .......... 65

CONCLUSION ..................................................................................... 67

CERTIFICATE OF COMPLIANCE ......................................................... 68

CERTIFICATE OF SERVICE ................................................................. 69

Appellate Case: 24-1626    Page: 5    Date Filed: 06/21/2024    Entry ID: 5406004

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.L.A. Schechter Poultry Corp. v. United States,*
  295 U.S. 495 (1935) ................................................................. *passim*

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.,*
  594 U.S. 758 (2021) ................................................................. *passim*

*Ali v. Fed. Bureau of Prisons,*
  552 U.S. 214 (2008) ........................................................................ 33

*Am. Bus Ass'n v. Slater,*
  231 F.3d 1 (D.C. Cir. 2000) ........................................................... 19

*Am. Meat Inst. v. USDA,*
  760 F.3d 18 (D.C. Cir. 2014) ................................................... 63–64

*Am. Power & Light Co. v. SEC,*
  329 U.S. 90 (1946) .......................................................................... 65

*Arkansas Game & Fish Comm'n v. United States,*
  568 U.S. 23 (2012) .......................................................................... 31

*Basic Inc. v. Levinson,*
  485 U.S. 224 (1988) .................................................................. 28–29

*Beecham v. United States,*
  511 U.S. 368 (1994) ........................................................................ 32

*Biden v. Nebraska,*
  143 S. Ct. 2355 (2023) .............................................................. *passim*

*Bittner v. United States,*
  598 U.S. 85 (2023) .......................................................................... 36

*California v. Texas,*
  141 S. Ct. 2104 (2021) .................................................................... 30

*Carter v. Carter Coal Co.,*
  298 U.S. 238 (1936) ........................................................................ 63

*Chevron v. N.R.D.C.,*
  467 U.S. 837 (1984) .................................................................. 23–24

Appellate Case: 24-1626     Page: 6     Date Filed: 06/21/2024 Entry ID: 5406004

*Crowell v. Benson*,
    285 U.S. 22 (1932) ................................................................ 50

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976) .............................................................. 19

*FEC v. Cruz*,
    596 U.S. 289 (2022) .............................................................. 30

*Gonzales v. Oregon*,
    546 U.S. 243, 259 (2006) ...................................... 41, 51, 55

*Graham Cnty. Soil & Water Conservation Dist. v.*
    *U.S. ex rel. Wilson*,
    559 U.S. 280 (2010) .............................................................. 33

*Gundy v. United States*,
    139 S. Ct. 2116 (2019) ..................................................... 6, 56

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995) .............................................................. 36

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ................................................................ 1

*J.W. Hampton, Jr., & Co. v. United States*,
    276 U.S. 394 (1928) ........................................................... 3, 56

*Loper Bright Enterprises v. Raimondo*,
    143 S. Ct. 2429 (2023) ......................................................... 24

*Louisiana Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986) ................................................... 8, 19–20

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*,
    595 U.S. 109 (2022) .............................................................. 56

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023) .............................................................. 62

*Norfolk & Western Ry. Co. v. Am. Train Dispatchers Ass'n*,
    499 U.S. 117 (1991) .............................................................. 33

*U.S. ex rel. O'Keefe v. McDonnell Douglas Corp.*,
    132 F.3d 1252 (8th Cir. 1998) ........................................... 47

*Panama Refin. Co. v. Ryan*,
    293 U.S. 388 (1938) ................................................... *passim*

Appellate Case: 24-1626   Page: 7   Date Filed: 06/21/2024 Entry ID: 5406004

*Rodriguez v. United States,*
    480 U.S. 522 (1987) ................................................................. 62

*Sackett v. EPA,*
    598 U.S. 651 (2023) ................................................................. 51

*SAS Inst., Inc. v. Iancu,*
    138 S. Ct. 1348 (2018) ............................................................ 20

*Schindler Elevator Corp. v. U.S. ex rel. Kirk,*
    563 U.S. 401 (2011) ................................................................. 42

*Solid Waste Agency of N. Cook Cnty. v.*
    *U.S. Army Corps of Eng'rs,*
    531 U.S. 159 (2001) ................................................................. 49

*Tamari v. Bache & Co. (Lebanon) S.A.L.,*
    838 F.2d 904 (7th Cir. 1988) ................................................. 27

*TSC Indus., Inc. v. Northway, Inc.,*
    426 U.S. 438 (1976) ................................................................. 47

*U.S. Telecom Ass'n v. FCC,*
    855 F.3d 381 (D.C. Cir. 2017) ............................................... 54

*Union Pac. R.R. Co. v. Surface Transp. Bd.,*
    863 F.3d 816 (8th Cir. 2017) ................................................. 32

*Union Pac. R.R. Co. v. U.S. Dep't of Homeland Sec.,*
    738 F.3d 885 (8th Cir. 2013) ................................................. 50

*United States v. United Verde Copper Co.,*
    196 U.S. 207 (1905) ................................................................. 58

*Util. Air Regul. Grp. v. EPA,*
    573 U.S. 302 (2014) ........................................... 30, 50, 52–53

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ................................................................. 51

*Wayman v. Southard,*
    23 U.S. (10 Wheat.) 1 (1825) ................................................ 57

*West Virginia v. EPA,*
    597 U.S. 697 (2022) ..................................................... *passim*

*Whitman v. Am. Trucking Ass'ns, Inc.,*
    531 U.S. 457 (2001) ..................................................... *passim*

Appellate Case: 24-1626    Page: 8    Date Filed: 06/21/2024    Entry ID: 5406004

*Yates v. United States,*
    574 U.S. 528 (2015)............................................................ *passim*

## Constitutional Provision

U.S. Const. art. I, § 1............................................................ 3, 56

## Statutes

15 U.S.C. § 77aa ................................................................ 37

15 U.S.C. § 77b(b) ........................................................ 43, 59

15 U.S.C. § 77c ................................................................... 42

15 U.S.C. § 77g(a)(1) ................................................... *passim*

15 U.S.C. § 77i(a) ................................................................. 1

15 U.S.C. § 77j .................................................................... 38

15 U.S.C. § 77s(a) ............................................................... 41

15 U.S.C. § 78b ................................................................... 44

15 U.S.C. § 78b(2) .............................................................. 44

15 U.S.C. § 78b(3) .............................................................. 44

15 U.S.C. § 78b(4) ........................................................ 44, 52

15 U.S.C. § 78bb ................................................................. 42

15 U.S.C. § 78i(a) ................................................................. 1

15 U.S.C. § 78*l*(b) ........................................................ 15, 38

15 U.S.C. § 78*l*(b)(1) .......................................................... 39

15 U.S.C. § 78*l*(b)(1)(F)–(L) ............................................. 39

15 U.S.C. § 78*l*(b)(1)(L) ..................................................... 39

15 U.S.C. § 78*l*(g) ........................................................ 15, 39

15 U.S.C. § 78m(a) .............................................................. 40

15 U.S.C. § 78m(b)(1) ......................................................... 40

15 U.S.C. § 78mm ............................................................... 42

15 U.S.C. § 78o ................................................................... 42

15 U.S.C. § 78w(a)(1) ..................................................... 40–41

Appellate Case: 24-1626     Page: 9     Date Filed: 06/21/2024    Entry ID: 5406004

18 U.S.C. § 1519 ...................................................................... 35

# Regulations

17 C.F.R. § 210 ........................................................................ 1

17 C.F.R. § 229–230 ................................................................. 1

17 C.F.R. § 229.1500 ......................................................... 12–13

17 C.F.R. § 229.1500(4) ..................................................... 14, 18

17 C.F.R. § 229.1501 ......................................................... 10, 21

17 C.F.R. § 229.1501(a) ......................................... 10–11, 26–27

17 C.F.R. § 229.1501(b)(1) ..................................................... 11

17 C.F.R. § 229.1502(a) ......................................... 10, 13–14, 28

17 C.F.R. § 229.1504 ............................................................. 21

17 C.F.R. § 229.1505(a)(1) ............................................... 10, 12

17 C.F.R. § 232 ........................................................................ 1

17 C.F.R. § 239 ........................................................................ 1

17 C.F.R. § 249 ........................................................................ 1

# Other Authorities

Business and Financial Disclosure Required by Regulation
   S–K, 81 Fed. Reg. 23,916, 23,971 (Apr. 22, 2016) ................................ 8

Commission Guidance Regarding Disclosure Related to
   Climate Change, 18 (Feb. 2, 2010),
   https://www.sec.gov/files/rules/interp/2010/33-9106.pdf ....... 27, 43, 48

*Finance, Merriam-Webster*, https://www.merriam-
   webster.com/dictionary/finance (last visited June 13,
   2024) ................................................................................ 40

*Financial, Merriam*-Webster, https://www.merriam-
   webster.com/dictionary/financial (last visited June 13,
   2024) ................................................................................ 39

H.R. Rep. No. 116-563 (2020) ................................................. 54

H.R. Rep. No. 117-39 (2021) ................................................... 54

Appellate Case: 24-1626     Page: 10     Date Filed: 06/21/2024 Entry ID: 5406004

Karmel, Roberta S., SEC Comm'r, *Changing Concepts of Materiality* (Apr. 12, 1978), https://www.sec.gov/news/speech/1978/041278karmel.pdf ............... 27

Paredes, Troy A., *Blinded by the Light: Information Overload and Its Consequences for Securities Regulation*, 81 Wash. U. L. Q. 417, 418–19 (2003) ................................................. 48

Peirce, Hester, M., SEC Comm'r *Green Regs and Spam: Statement on the Enhancement and Standardization of Climate-Related Disclosures for Investors* (Mar. 6, 2024), https://www.sec.gov/news/statement/peirce-statement-mandatory-climate-risk-disclosures-030624 ................................. 9, 26

S. 1217, 117th Cong. (2021) ................................................. 54

S. 2075, 116th Cong. (2019) ................................................. 54

S. 3481, 115th Cong. (2018) ................................................. 54

The Enhancement and Standardization of Climate-Related Disclosures for Investors, 89 Fed. Reg. 21,668 (Mar. 28, 2024) (to be codified at 17 C.F.R. §§ 210, 229, 230, 232, 239, 249) .................................................................. *passim*

U.S. Secs. & Exch. Comm'n, Order Issuing Stay, *In the Matter of the Enhancement and Standardization of Climate-Related Disclosures for Investors*, File No. S7-10-2 (Apr. 4, 2024), available at https://www.sec.gov/files/rules/other/2024/33-11280.pdf .................. 17

Uyeda, Mark T., SEC Comm'r, *A Climate Regulation under the Commission's Seal: Dissenting Statement on The Enhancement and Standardization of Climate-Related Disclosures for Investors* (Mar. 6, 2024), https://www.sec.gov/news/statement/uyeda-statement-mandatory-climate-risk-disclosures-030624; ................................. 9, 26

Appellate Case: 24-1626     Page: 11     Date Filed: 06/21/2024 Entry ID: 5406004

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 15 U.S.C. § 77i(a), which permits a person aggrieved by a Commission order, including a final rule, to petition for review in the court of appeals.

The Alliance petitioned for review on March 26, 2024. The petition is timely because it was filed "within sixty days" of the Commission's finalization of the rule on March 6, 2024 and publication of the rule on March 28, 2024. 15 U.S.C. § 78i(a); 17 C.F.R. §§ 210, 229–230, 232, 239, 249.

Petitioners have standing. Both have members who are directly subject to the Rule's requirements. Those members would have standing to challenge the Rule in their own right. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977) (association has standing where members are suffering current or threatened harm and members would have standing to challenge action directly).

Appellate Case: 24-1626    Page: 12    Date Filed: 06/21/2024 Entry ID: 5406004

# STATEMENT OF THE ISSUES

(1) Whether the Securities and Exchange Commission's authority to promulgate rules "in the public interest, or for the protection of investors," under the Securities Act and the Exchange Act, authorizes environmental and social governance disclosures that are not of direct financial relevance to investors?

(2) Whether there is a governing intelligible principle—as required by the nondelegation doctrine—if the Commission's authority to promulgate rules "in the public interest, or for the protection of investors" is interpreted so elastically as to allow imposition of environmental and social governance disclosures that are not of direct financial relevance to investors?

The most relevant authorities for the statutory question are:

- *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758 (2021);

- *Biden v. Nebraska*, 143 S. Ct. 2355 (2023);

- *West Virginia v. EPA*, 597 U.S. 697 (2022);

- *Yates v. United States*, 574 U.S. 528 (2015);

- 15 U.S.C. § 77g(a)(1);

2

- U.S. Const. Art. 1, Sec. 1.

The most relevant authorities for the nondelegation question are:

- *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935);

- *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928);

- *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935);

- *Whitman v. Am. Trucking Ass'ns*, Inc., 531 U.S. 457 (2001);

- U.S. Const. Art. 1, Sec. 1.

Appellate Case: 24-1626    Page: 14    Date Filed: 06/21/2024 Entry ID: 5406004

## INTRODUCTION

For the first time in its ninety-year history, the U.S. Securities and Exchange Commission has seized power to compel disclosures from publicly traded companies on environmental and social governance ("ESG") matters that have nothing to do with the agency's statutory mission of protecting investors and facilitating healthy capital markets. *See* The Enhancement and Standardization of Climate-Related Disclosures for Investors, 89 Fed. Reg. 21,668 (Mar. 28, 2024) (Commission's Mar. 6, 2024 "Climate Rule" to be codified at 17 C.F.R. §§ 210, 229, 230, 232, 239, 249). In a dramatic departure from its historic mission, the Commission now seeks to arrogate, to itself, Congress's exclusive authority to decide national climate change policy. And worse, the Commission seeks to transform its limited regulatory authority into an ***unfettered discretionary power*** to compel disclosure on ***any matter*** that politically motivated investors might care about—regardless of how tenuous or completely disconnected those disclosures may be from legitimate financial concerns.

The Climate Rule will require disclosures on such matters as whether a company has established a corporate governance structure to

4

monitor and respond to climate change threats and will require disclosure of greenhouse gas emissions. But under the Commission's view of its power, as set forth in the Climate Rule, the Commission could require companies to make disclosures on any conceivable issue. This roving view of the Commission's power is incompatible with the limited rulemaking powers delegated in the statutory text, and is completely alien to the concerns that motivated Congress to enact the Securities Act and the Securities and Exchange Act (collectively, "Securities Laws").[1]

Congress created the Commission during the Great Depression in response to an economic problem—*i.e.*, a public concern that has nothing to do with the agency's newfound worry that investors "need" information in waging ideological battles for control of the corporate board room. Congress enacted the Securities Act and the Exchange Act because there was an urgent need to restore investor confidence in America's capital markets in the wake of the market crash of 1929. To that end, Congress imposed various disclosure requirements in the statutory text—all of which go to matters of obvious relevance to financially focused investors.

---

[1] For ease of the reader, the Petitioners refer to the Securities and Exchange Act as the "Exchange Act" hereafter.

But now the Commission claims that Congress delegated power for the agency to "build on" Congress' disclosure framework and to impose ***any rule*** that any three Commissioners deem "in the public interest or for the protection of investors." Climate Rule, 89 Fed. Reg. at 12,683.

This Court must reject the Commission's elastic interpretation of its rulemaking authority—not least because this unbounded view of its powers would violate the nondelegation doctrine. The Constitution forbids Congress from delegating rulemaking powers without a governing intelligible principle. *See Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (Kagan, J., plurality op.) (affirming that "we would face a nondelegation question" if the statute "grant[ed] the [agency] plenary power" to make whatever rules it deems "fit[.]"). And there simply is no governing principle if the Commission wields open-ended powers, as it claims, to police corporate America with whatever socially or politically minded disclosure rules that a Triumvirate of Commissioners might "think desirable." *Panama Refin. Co. v. Ryan*, 293 U.S. 388, 421 (1938).

The Commission maintains that it can compel any disclosure whenever any segment of investors demand that information; however, this would deny any limiting principle. If that were true, there would be

no limit to what information the Commission might demand. After all, there will always be investors who would like the Commission to compel disclosure of information that might be useful in their social or political battles with corporate America—whatever the hot-button issue of the day.

As such, this Court should reasonably interpret the Securities Laws as denying the Commission open-ended rulemaking powers. The authority to promulgate disclosure rules "in the public interest or for the protection of investors" is not nearly as capacious as the Commission claims. Climate Rule, 89 Fed. Reg. at 12,683. Read in context—as the canons of construction require—the Commission has authority only to require disclosures of a similar nature to those that Congress has spelled out expressly in the text. This plainly limits the Commission to disclosure rules on financially relevant matters. And, in any event, this Court can easily reject the Commission's free-wheeling view of its rulemaking authority under the major questions doctrine because Congress must speak clearly when delegating on matters of major "economic and political" consequence. *West Virginia v. EPA*, 597 U.S. 697, 721 (2022).

Appellate Case: 24-1626    Page: 18    Date Filed: 06/21/2024 Entry ID: 5406004

Because the Commission's Climate Rule will impose burdensome and disruptive disclosure requirements, the Texas Alliance of Energy Producers and the Domestic Energy Producers Alliance (collectively "Alliance") seek an order setting aside the rule. Because "an agency literally has no power to act . . . unless and until Congress confers power upon it[,]" the Commission has no business imposing ESG disclosure rules that Congress never contemplated. *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). But if Congress truly delegated the open-ended powers the Commission claims, the delegation of such ungoverned power violates separation of powers.

## STATEMENT OF THE CASE

### A.    The Commission's Climate Rule

After two years of deliberation, the Commission adopted the Climate Rule on March 6, 2024. From its inception, the Rule sparked controversy. The Commission had previously disavowed statutory authority to require disclosures on environmental matters unrelated to obvious financial concern to profit-focused investors. *See* Business and Financial Disclosure Required by Regulation S–K, 81 Fed. Reg. 23,916, 23,971 (Apr. 22, 2016) ("In 1975, the Commission considered a variety of

8

'environmental and social' disclosure matters . . . [and] [f]ollowing extensive proceedings on these topics, the Commission concluded that it generally is not authorized to consider the promotion of goals unrelated to the objectives of the federal securities laws when promulgating disclosure requirements . . . ."). But now, for the first time in its ninety-year history, it claims to have discovered power to compel corporate disclosures on anything that politically minded investors might care about—regardless of how tenuous such matters might be the reasonable investor in making objective financial decisions.

Not surprisingly, two of the Commissioners dissented.[2] The dissenters argued that the Commission was exceeding its powers. But the die was cast. In the final vote, three unelected and unaccountable Commissioners decided—for the entire country—that publicly traded companies must begin making controversial climate-related disclosures.

---

[2] *See* Mark T. Uyeda, SEC Comm'r, *A Climate Regulation under the Commission's Seal: Dissenting Statement on The Enhancement and Standardization of Climate-Related Disclosures for Investors* (Mar. 6, 2024), https://www.sec.gov/news/statement/uyeda-statement-mandatory-climate-risk-disclosures-030624; *see also* Hester M. Peirce, SEC Comm'r, *Green Regs and Spam: Statement on the Enhancement and Standardization of Climate-Related Disclosures for Investors* (Mar. 6, 2024), https://www.sec.gov/news/statement/peirce-statement-mandatory-climate-risk-disclosures-030624 ("Peirce Dissent").

9

Among other new disclosure requirements, public companies must now: (1) acknowledge if they have yet to establish governance structures for confronting climate change, 17 C.F.R. § 229.1501; (2) report their greenhouse gas emissions if the Commission might deem them "material," *id.* § 229.1505(a)(1); and (3) acknowledge all conceivable "climate-related risks that" the Commission may deem "reasonably likely to have a material impact" on either the company's "financial condition" *or* financially irrelevant matters of business "strategy" and "operations." *Id.* § 229.1502(a). These disclosures are mandatory even when there is no reason for believing that financially focused investors would find the information helpful in making reasoned investment decisions.

### 1.    Climate Change Governance Disclosures

Regardless of whether there is any financial relevance, the Climate Rule mandates that every public company must "[d]escribe [its] board of directors' oversight of climate-related risks." 17 C.F.R. § 229.1501(a). This will compel companies that defy environmental activism to make a public admission (against public relation interests) that they have refused to institutionalize climate change concerns as a corporate priority. As such, companies will feel added pressure to develop new

10

corporate governance structures to monitor and respond to climate change risks to minimize the risk of negative press that might follow from an admission that they are not prioritizing climate change activism.

For companies that have prioritized climate change concerns, they must "identify any board committee or subcommittee responsible for the oversight of climate-related risks." *Id.* They must explain the "relevant expertise" of any officer or committee member charged with corporate climate change oversight. *Id.* § 229.1501(b)(1). Accordingly, companies must designate individuals with avowed "expertise" or they will be forced to admit that their corporate climate change officers or committee members have no special expertise with climate change issues.

Further, they must disclose any "climate-related target or goal" the company has committed to reaching—even if that is an internal decision that they do not wish to broadcast publicly. *Id.* § 229.1501(a). And they must "describe whether and how the board of directors oversees progress . . . ." *Id.* Conversely, if a company has declined to commit to reducing its emissions or taking other actions to confront climate change, the company must publicly admit that it is not doing anything to respond to climate change activist concerns.

11

## 2. Greenhouse Gas Emission Disclosures

The Climate Rule now requires "large accelerated filer[s]" and "accelerated filers" to report their attributable greenhouse gas emissions. *Id.* § 229.1505(a)(1). First, the Rule requires these companies to report their "direct GHG emissions from operations that are owned or controlled by [the company]" ("Scope 1 Emissions") *Id.* § 229.1500. Second, they must report their "indirect GHG emissions from the generation of purchased or acquired electricity, steam, heat, or cooling that is consumed by operations owned or controlled by [the company]" ("Scope 2 Emissions"). *Id.*

These disclosures are mandatory for all Scope 1 and 2 Emissions that the Commission deems "material" "for [the company's] most recently completed fiscal year."[3] *Id.* § 229.1505(a)(1). Neither the Securities Act nor the Exchange Act define the term "material." Nor does the Climate Rule explicitly define what it means for emissions to be "material."[4]

---

[3] Disclosure is also mandatory if the Commission deems Scope 1 and 2 Emissions "material" "for the historical fiscal year(s) included in the consolidated financial statements in the filing." *Id.* § 229.1505(a)(1).

[4] The Climate Rule fails to provide any quantitative standard for materiality, but instead notes, "where the rules reference materiality—

### 3. Climate Change Risk Disclosures

Even setting aside Scope 1 and 2 Emission disclosure requirements, the Rule requires disclosure of all information (including a company's direct or indirect GHG emissions) to the extent it may be viewed as presenting a "climate-related risk" that is "reasonably likely to have a material impact" on the company. *Id.* § 229.1502(a). The Rule specifies that this requires disclosure of not only potential impacts to the company's financial condition, but also any potential adverse impact to the company's "strategy" or its "operations." *Id.* This means that a company must disclose its emissions (or anything else) that might have some adverse impact on its "strategy" or "operations"—regardless of whether there is any basis for believing there would be any impact on the company's "financial condition." *Id.*

And, of course, the Climate Rule defines "climate-related risks" broadly to encompass the entire universe of conceivable risks attributable to climate change. *Id.* § 229.1500. The Rule makes clear that

---

consistent with our existing disclosure rules and market practices—materiality refers to the importance of information to investment and voting decisions about a particular company, not to the importance of the information to climate-related issues outside of those decisions." Climate Rule, 89 Fed. Reg. at 21,671.

Appellate Case: 24-1626      Page: 24      Date Filed: 06/21/2024 Entry ID: 5406004

this entails "transition risks," which entails all indirect consequences of climate change that may affect the company. *Id.* § 229.1500(4). As such, reporting companies must anticipate every imaginable scenario that might arise from different "regulatory, technological, and market changes" attributable to societal attempts to "mitigat[e]" or "adapt[] to" climate change. *Id.* The Rule then requires reporting companies to report on any conceivable "climate-related risk" that is even arguably likely to have an impact on their "strategy, results of operations, ***or*** financial condition." *Id.* § 229.1502(a) (emphasis added).

## B.    The Commission's Claimed Authority

The Commission principally invokes Section 7(a)(1) of the Securities Act, 15 U.S.C. § 77g(a)(1), as the basis for its rulemaking authority. *See* Climate Rule, 89 Fed. Reg. at 21,683. That provision requires that every "registration statement, when relating to a security" must include specified information that Congress deemed important for investors; however, it also provides that the Commission may require additional disclosures "as the Commission may by rules or regulations require as being necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 77g(a)(1). The Commission claims

14

that this "authorized the Commission to update and build on the framework" that Congress had developed when enumerating financially focused disclosure requirements. Climate Rule, 89 Fed. Reg. at 21,683.

As such, the Commission asserts that it has broad discretion to decide that new disclosure rules are "necessary or appropriate" to serve the "public interest or for the protection of investors." *Id.* And the Commission claims that the Climate Rule advances the "public interest" or serves to "protect[] . . . investors" because the Commission has decided (by a 3-2 vote) that climate-change disclosures will "elicit information that [some] investors have indicated is important to their investment and voting decisions." *Id.* at 21,685.

Likewise, the Commission claims that it has broad authority because other provisions use this same language in authorizing rules as the Commission deems "necessary or appropriate in the public interest or for the protection of investors." *Id.* at 21,683 (claiming authority under sections 12(b) and (g), 15 U.S.C. § 78*l*(b) and (g), of the Exchange Act). In all, the Commission points to ten different provisions as the supposed basis for its statutory authority. *Id.* at 21,912 (invoking "the authority set forth in sections 7, 10, 19(a), and 28 of the Securities Act . . . and sections

15

3(b), 12, 13, 15, 23(a), and 36 of the Exchange Act . . . .". But the Commission points to no *textual authority* for requiring disclosure of financially irrelevant information, except in its repeated assertion that Congress has delegated capacious authority to decide what disclosures will serve "the public interest or for the protection of investors." *Id.* at 21,863.

### C.    Injury to Texas Alliance and DEPA

Petitioners, the Texas Alliance of Energy Producers ("Texas Alliance") and the Domestic Energy Producers Alliance ("DEPA") are non-profit 501(c)(6) membership organizations. *See* Mot. Stay, Ex. A, Decl. of Karr Ingham ¶3; Ex. B, Decl. of Jerry Simmons ¶3. Headquartered in Wichita Falls, Texas, the Texas Alliance represents approximately 1,800 businesses in the energy field, primarily small businesses. Ex. A, Ingham Decl. ¶4. Likewise, DEPA represents the businesses and entrepreneurs who keep America's energy infrastructure system running. DEPA's membership includes 23 publicly traded corporations and over 100 non-public companies, all of which are engaged in domestic onshore oil and natural gas exploration and production. Ex. B, Simmons Decl. ¶4.

The Texas Alliance and DEPA (collectively, the "Alliance") brought this lawsuit and filed a motion to stay enforcement of the Climate Rule because it would have imposed irrecoverable compliance costs on their members.[5] In response to various motions for emergency relief then pending before this Court, the Commission issued a voluntary stay on April 4, 2024. U.S. Secs. & Exch. Comm'n, Order Issuing Stay, *In the Matter of the Enhancement and Standardization of Climate-Related Disclosures for Investors*, File No. S7-10-2 (Apr. 4, 2024), available at https://www.sec.gov/files/rules/other/2024/33-11280.pdf. This gave temporary relief for the many Alliance members who would have otherwise been forced to expend time, energy, and money to prepare for compliance with this new and unprecedented climate change disclosure regime. D.E. 5380129, at 35 ¶6 (Ingham Decl.), 42 ¶13 (Simmons Decl.).

But if the Climate Rule should ever go into effect, it will impose tremendous compliance costs on DEPA's publicly traded members. D.E. 5380129, at 42 ¶14 (Simmons Decl.). Not only will the Rule require these

---

[5] Petitioners filed a Petition for Review in the United States Court of Appeals for the Fifth Circuit on March 12, 2024. The case was transferred to this Court on March 21, 2024. *Tex. Alliance of Energy Producers, et al. v. SEC*, Case No. 24-1626, Consolidation and Transfer Order.

Appellate Case: 24-1626     Page: 28     Date Filed: 06/21/2024 Entry ID: 5406004

companies to expend time, energy, and money to ensure compliance, but it will cause injury in compelling disclosure of information that these companies want to remain confidential. D.E. 5380129, at 42 ¶15 (Simmons Decl.). And in compelling their speech, the Climate Rule will operate to shame companies that have declined to institutionalize an anti-climate change agenda. D.E. 5380129, at 42 ¶12 (Simmons Decl.).

Members that have declined to prioritize climate change concerns in their governance structure and in setting strategic goals will be forced to tell the world that they are not taking any action to confront climate change. D.E. 5380129, at 42 ¶16 (Simmons Decl.). And relatedly, the Climate Rule will cause reputational injuries to Alliance members because it requires disclosure of "climate-change risks" associated with working with companies (including small businesses within the Alliance's membership) that may be perceived as contributing to climate change, or as failing to sufficiently embrace an anti-climate change agenda. 17 C.F.R. § 229.1500(4) (defining "climate-related risks" to include risks stemming from "reputational impacts" such as "those stemming from a registrant's customers or business counterparties"); D.E. 5380129, at 37 ¶11 (Ingham Decl.). More broadly, the Climate Rule

18

will harm Alliance members because it will create incentives for public companies to shift away from reliance on the traditional energy sources that Alliance members deliver. D.E. 5380129, at 42 ¶12 (Simmons Decl.).

## SUMMARY OF ARGUMENT

The Commission has "no inherent powers." *See Am. Bus. Ass'n v. Slater*, 231 F.3d 1, 9 (D.C. Cir. 2000) (Sentelle, J. concurring) (citing *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986)). Like all federal agencies, the Commission is a "creature[] of statute, and may act only because, and only to the extent that, Congress affirmatively has delegated [it] the power to act." *Id.* The Commission exists only because Congress created it and charged it with an objective mission in response to a particular problem. Specifically, Congress charged the Commission with the singular goal of regulating America's financial markets to restore investor confidence in the wake of the stock market crash of 1929. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 (1976).

But the Commission's authority to regulate financial markets cannot be "transform[ed]" into a roving power to pursue regulatory goals that the Congress of the 1930s never envisioned. *Nebraska*, 143 S. Ct. at 2369. No matter how much any three Commissioners might desire to

19

confront climate change (or any other *perceived* societal problem), they cannot grant the Commission more authority than Congress has given because an administrative agency "literally has no power to act . . . unless and until Congress confers power upon it." *See Louisiana Pub. Serv. Comm'n*, 476 U.S. at 374. As such, they are limited to the authority delegated in the text of the Securities Act and the Exchange Act. *See SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018) (affirming that agencies have a "duty . . . to follow [the textual] commands as written, not to supplant those commands with others it may prefer."). And the text confirms—when applying the ordinary canons of statutory construction—that the Commission's authority to compel corporate disclosures is limited to matters of direct financial relevance to reasonable (*i.e.*, profit focused) investors.

But in finalizing the Climate Rule, the Commission now asserts an unlimited power to impose any disclosure rule that it deems fit whenever any segment of investors say that they want that information to advance their politicized goals—regardless of how tenuous of a connection, if any, there may be to financially relevant concerns. For example, the Commission justifies the Climate Rule because activist investors might

want information about a company's greenhouse gas emissions or its overall commitment to combatting climate change when voting on board members. Climate Rule, 89 Fed. Reg at 21,685 ("[T]he Commission is adopting the final rules based on its determination that the required disclosures will elicit information that investors have indicated is important to their investment *and* voting decisions.") (emphasis added). For that matter, the Rule requires disclosure of a company's governance structure for monitoring and responding to climate-change concerns regardless of whether this information is deemed a "material" concern for financially focused investors. *Compare* 17 C.F.R. § 229.1504 (contemplating something of a materiality requirement); *with Id.* § 229.1501 (requiring disclosure without any materiality requirement).

Yet the Commission maintains that it can compel *any* disclosure— even on matters of no financial relevance. Why? Because Congress delegated authority to require disclosures "in the public interest, or for the protection of investors." Climate Rule, 89 Fed. Reg. at 21,683. But however capacious this delegation may seem at first blush, the surrounding text and structure of the Securities Act and the Exchange

21

Act make clear that Congress was not giving a blank check of rulemaking authority here.

The canons confirm that the authority to promulgate disclosure rules "in the public interest or for the protection of investors" is limited to disclosures of financially relevant information. *Id.* That is so because Congress enumerated examples of the sort of disclosures that Congress had in mind—all of which go to matters of obvious financial relevance for profit-driven investors. And further, this narrowing construction is necessary to avoid serious separation of powers problems that arise when a statute is interpreted as delegating ungoverned rulemaking powers.

Yet this Court can easily resolve this controversy without engaging in granular textual analysis because this is a "major questions" case. The question of whether the United States should impose regulation in response to climate change is a weighty matter that our system reserves for Congress; and for this reason, the major questions doctrine requires that an agency must point to a "clear statement" to authorize regulation touching on climate change regulatory policy. And the nebulous authority to make rules "in the public interest or for the protection of investors" is insufficient. *Id.*

Appellate Case: 24-1626     Page: 33     Date Filed: 06/21/2024 Entry ID: 5406004

Finally, should this Court construe such language as authorizing the Climate Rule, the burden would fall to the Commission to point to some objective standard governing, or guiding, the exercise of its discretion in deciding what disclosures it shall deem "in the public interest or for the protection of investors." *Id.* But if this delegation is construed as an elastic authority for the Commission to impose whatever rules it might deem fit, then there is no governing intelligible principle. At that point this Court is bound to find a nondelegation violation consistent with the Supreme Court's decisions in *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935) ("*Panama Refining*"), and *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) ("*Schechter*").

## ARGUMENT

## STANDARD OF REVIEW

This Court typically reviews claims challenging an agency's assertion of rulemaking authority under the framework set forth in *Chevron v. N.R.D.C.*, 467 U.S. 837 (1984). *Chevron* provides that a Court must reject an agency's claim of rulemaking authority if either (1) the statutory text forecloses the agency's interpretation, or (2) the agency's

23

interpretation is otherwise unreasonable.[6] But in a case where an agency asserts authority to regulate on issues of "vast economic and political significance," the major questions doctrine places a heavier burden on the federal agency to justify its assertion of regulatory power. *See West Virginia*, 597 U.S. at 716. Where the major questions doctrine applies, the agency must point to a clear statement authorizing regulation of the subject at hand. *Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023).

If an agency prevails in its assertion of statutory authority, the Court must then resolve any corresponding nondelegation claim under the "intelligible principle" test, which requires that the agency must identify statutory language to govern and control the exercise of administrative discretion. *See Whitman v. Am. Trucking Ass'ns*, Inc., 531 U.S. 457, 472 (2001) (affirming that Congress must set down an "intelligible principle" to which the agency is "directed to conform.").

---

[6] The Supreme Court is reconsidering the *Chevron* standard in *Loper Bright Enterprises v. Raimondo*, 143 S. Ct. 2429 (2023) (No. 22-451).

Appellate Case: 24-1626    Page: 35    Date Filed: 06/21/2024 Entry ID: 5406004

## I. The Climate Rule Compels Financially Irrelevant Disclosures

As shall be explained further in Section II, the Commission is limited to requiring disclosures on matters of obvious financial relevance to investors seeking to understand the risks or potential rewards of investment. But while the Commission has framed the Climate Rule as responding to investor concerns, there is no way to reconcile its new sweeping proscriptions for environmental and social governance disclosures with the fact that Congress has limited the Commission's authority. And, at bottom, even the Commission acknowledges that its claimed authority rests on an (errant) view that it can compel disclosures on *any subject* whenever any segment of investors say that such information might inform their "voting decisions" in corporate board elections. Climate Rule, 89 Fed. Reg. at 21,685. That is, the Commission claims power to compel disclosures even if the investors' motivation in wanting targeted information is entirely political or ideological. *See* Climate Rule, 89 Fed. Reg. at 21,848, n.2743 (acknowledging that there are "investors who exhibit nonpecuniary preferences" in calling for climate change disclosures).

Appellate Case: 24-1626    Page: 36    Date Filed: 06/21/2024 Entry ID: 5406004

No matter how many "ribbons" the Commission adds, there is no hiding that the Climate Rule is about advancing environmental goals—not about helping investors understand the financial risks and rewards of investment. Peirce Dissent, *supra* n.2 ("While the Commission has decorated the final rule with materiality ribbons, the rule embraces materiality in name only."). Even as the Commission attempts to dress the Rule with claims that investors need climate change information to assess investment risk, the truth is that any connection to legitimate financial investment concerns is tenuous at best.[7] And, in some cases, the Commission does not even attempt to tie its new disclosure rules to any concern over "material" financial concerns. *E.g.,* 17 C.F.R. § 229.1501(a) (imposing a categorical rule that public companies must report any "climate-related target or goal" that reporting companies have committed to pursuing).

---

[7] *See also* Uyeda Dissent, *supra* n.2 ("After the rule goes into effect, companies will have a duty to provide prescriptive, climate-related disclosure knowing that any non-disclosure, including assessments of materiality, will be judged in hindsight. To avoid potential liability, companies may voluntarily disclose climate-related information despite concluding that the information is immaterial. . . . The takeaway is that climate will be nearly everything, everywhere, all at once for public companies.")

Appellate Case: 24-1626   Page: 37   Date Filed: 06/21/2024 Entry ID: 5406004

The unavoidable problem for the Commission is that there is no way to determine *ex ante* whether and how environmental and social governance issues will or will not impact the financial condition of every public company in the United States. Investors are not clairvoyant. *See Tamari v. Bache & Co. (Lebanon) S.A.L.*, 838 F.2d 904, 907 (7th Cir. 1988). For example, the Climate Rule imposes a categorical mandate that all public companies must report their corporate governance structures for "oversight of climate-related risks." 17 C.F.R. § 229.1501(a). But while climate change risks may be relevant to the financial outlook of some companies, one cannot say that climate change invariably imposes risk to the financial outlook of every company. This is why the Commission's 2010 Guidance on reporting climate change risks appropriately concluded that the question of whether and to what degree climate change poses any financially relevant risk must be assessed on a case-by-case basis—considering all the pertinent facts. *See* Commission Guidance Regarding Disclosure Related to Climate Change, 18 (Feb. 2, 2010) ("2010 Guidance").[8] *See also* Roberta S. Karmel, SEC Comm'r, *Changing Concepts of Materiality*,  13 (Apr. 12, 1978), https://www.sec.gov/news/sp

---

[8] *Available at* https://www.sec.gov/files/rules/interp/2010/33-9106.pdf.

eech/1978/041278karmel.pdf ("Since our concept of materiality is a function of the reasonable investor, we can be no less fluid than the expectations of . . . the nation's shareholders.").

Likewise, the Climate Rule seeks to compel financially irrelevant information in mandating disclosures on "climate-related risks" that are "reasonably likely to have a material impact" on the company's "strategy" or "operations," irrespective of whether it is likely to impact the company's "financial condition." *Id.* § 229.1502(a). Here again, the Commission is plainly reaching beyond its authority to regulate disclosure of financially relevant matters. To be sure, the Commission can legitimately compel disclosure of risks affecting a company's "strategy" or "operations," but only when there was reason to believe that such risks ultimately translate into financial risks because that is the ultimate touchstone for financially focused investment decisions. *Id.*

For that matter, there is no basis for requiring disclosure of greenhouse gas emissions except to the extent that there is a specific basis to believe that information has financial relevance, under the circumstances, for the company in question. *See Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988) ("[M]ateriality 'will depend at any given time

28

upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.'"). A company operating under a cap-and-trade regime in California (or elsewhere) may need to report its emissions because there may be direct financial implications in that scenario. But it would be wrong to assume that greenhouse gas emissions are *per se* relevant for companies that do not have significant operations in California or similar jurisdictions. *See id.* at 239 (materiality turns on specific facts).

## II.     The SEC Lacks Statutory Authority for the Climate Rule

### A.     The Statutory Text Limits the Commission to Regulating Financially-Relevant Information

Not surprisingly for statutes enacted in response to a financial crisis, the text of the Securities Act and the Exchange Act clearly limit the Commission to promulgating disclosure rules on *financially relevant* matters. And even if that was not clear from the text and structure of the Securities Laws, it would be unreasonable to assume Congress intended to delegate an open-ended rulemaking authority for the Commission to pursue any disclosure rules it might deem fit. As such, it is beyond the power of the Commission to impose financially irrelevant disclosure

29

rules. *See FEC v. Cruz*, 596 U.S. 289, 301 (2022) (affirming that "[a]n agency's regulation cannot 'operate independently of' the statute that authorized it.") (quoting *California v. Texas*, 141 S. Ct. 2104, 2119–20 (2021)).

In any event, the major questions doctrine places the burden on the Commission to point to "clear" authority to impose climate change disclosure rules because that is an issue of great economic and political significance. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("*UARG*") (requiring "clear congressional authorization" for a "transformative expansion in EPA's authority."). And it is impossible for the Commission to find clear authority for the Climate Rule because the Securities Act and the Exchange Act were enacted long before the modern political debate over climate change policy began in the 1970s. For all these reasons, this Court should approach the Commission's claim of "extravagant statutory power" with appropriate "skepticism." *West Virginia*, 597 U.S. at 724 (quoting *UARG*, 573 U.S. at 324).

### 1. The Text Unambiguously Denies Climate-Change Disclosure Rulemaking Authority

The Commission claims rulemaking authority for the Climate Rule because it has authority to impose rules as "necessary or appropriate in

30

the public interest or for the protection of investors." Climate Rule, 89 Fed. Reg. at 21,683. But as capacious as this delegated authority might seem when divorced from its statutory context, the terms 'public interest' and 'for the protection of investors' are not "empty vessel[s]" to be filled with whatever meaning a naked majority on the Commission might deem good policy. *West Virginia*, 597 U.S. at 732. On the contrary, the text and structure of the Securities Act and the Exchange Act confirm that these terms have an objective meaning that forecloses the Commission from deciding—on its own accord—what sort of public values it will pursue.

Read in context, the Commission is limited to promulgating disclosure rules on matters of obvious financially-relevance to investors. *See Nebraska*, 143 S. Ct. at 2378 (Barrett, J., concurring) (quoting Scalia, J.) ("'In textual interpretation, context is everything.' After all, the meaning of a word depends on the circumstances in which it is used.") *Cf. Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 36 (2012) ("[T]he first rule of . . . statutory interpretation is: Read on."). When construing statutory language, this Court must empty its interpretive toolbox by applying all the canons of construction before concluding a delegation of rulemaking authority is ambiguous. *See Yates v. United*

*States*, 574 U.S. 528, 537 (2015) ("[T]he plainness or ambiguity of statutory language is determined . . . [by] the specific context in which that language is used, and the broader context of the statute as a whole."). And here the canons confirm a narrowing construction that precludes the Commission from imposing corporate disclosure rules that have nothing to do with helping investors understand financial risks.

The canons require a wholistic reading of the Securities Laws. *See Beecham v. United States*, 511 U.S. 368, 372 (1994) ("The plain meaning that we seek to discern is the plain meaning of the whole statute, not isolated sentences."). Of course, the Commission would prefer to read its delegation to make rules "in the public interest, or for the protection of investors" in isolation because that is its only hope for justifying this foray into regulating financially irrelevant environmental and social governance matters. But courts do not interpret language divorced from its statutory context. *See Union Pac. R.R. Co. v. Surface Transp. Bd.*, 863 F.3d 816, 825 (8th Cir. 2017) (observing that the agency's interpretation was reasonable when reading statutory language "in isolation[,]" but concluding that the agency's "interpretation fades in the light of the full text and context.")

32

### i. The Fact Congress Enumerated Only Financially Relevant Disclosures Confirms That the Commission Lacks Authority to Regulate Other Matters

To begin, it matters that the statutory text enumerated many examples of the sort of disclosures that Congress thought appropriate because this gives a window into what Congress had in mind when authorizing additional disclosures. For this reason, the canons recognize that "a word may be known by the company it keeps." *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 287 (2010). Accordingly, in a case like this, where a statute enumerates specific regulatory requirements and delegates rulemaking authority for an agency to impose additional requirements as it may deem "necessary or appropriate," that delegation must be construed as limiting the agency's authority to rules of a similar character to those expressly enumerated in the text. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 223 (2008) ("[W]hen a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration.") (quoting *Norfolk & Western Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 129 (1991)).

33

The Supreme Court's decision in *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758 (2021), is instructive. In that case, the Centers for Disease Control and Prevention sought to expand its powers by myopically focusing on a single sentence in the Public Service Health Act of 1941, which authorized rules as the CDC deemed "necessary to control the spread of [contagious disease.]" *Id.* at 763. Relying on this unbounded view of its powers, the CDC imposed a nationwide eviction moratorium. The CDC claimed that it had authority for this foray into housing policy regulation because evicted tenants *might* move into tighter living quarters with others, and that this *might* contribute to the interstate transmission of COVID-19. *Id.* But the federal courts appropriately concluded that the CDC had exceeded its statutory authority because the seemingly capacious delegation to issue orders "necessary to prevent . . . communicable diseases" had to be interpreted with reference to the specific examples of orders that Congress had expressly authorized in the following sentence. *Id.* at 761.

Likewise, the Supreme Court's approach in *Yates v. United States*, 574 U.S. 528 (2015), counsels for a narrowing construction here. At issue in *Yates* was the Department of Justice's claim that it could prosecute a

34

fisherman because he threw an illegally caught fish overboard knowing that his vessel was subject to a federal inspection to enforce fishing regulations. *Id.* at 531. Rather than relying on statutes expressly governing commercial fishing, the Department choose to prosecute the fisherman under a statute that Congress had enacted to deter financial crimes in the wake of the infamous "collapse of the Enron Corporation[.]" *Yates*, 574 U.S. at 532.

The Sarbanes-Oxley Act, 18 U.S.C. § 1519, made it a federal crime to destroy any "tangible object" in anticipation of a federal investigation. As such, the Department argued that it could prosecute John Yates because he had destroyed a "tangible object" in anticipation of an investigation. But while a fish is undoubtedly a "tangible object" in a broad and literal sense, the Sarbanes-Oxley Act gave clear contextual clues that a fish was not the sort of tangible object that Congress had in mind. *Id.* at 536.

Of relevance here, the Court concluded that the "words immediately surrounding" the term "tangible object" served to "cabin the contextual meaning of that term." *Id.* at 543. Because "tangible object" was the "last in a list of terms that beg[a]n[] 'any record [or] document[,]'" *Yates* held

35

that it was appropriate to construe "tangible object" narrowly to refer only "to the subset of tangible objects involving records and documents, *i.e.*, objects used to record or preserve information." *Id.* at 544. And in the same way, the words accompanying the Commission's delegated authority to make rules "in the public interest or for the protection of investors" likewise serves to "cabin the contextual meaning" of that otherwise capacious authority.[9] *Id.* at 529.

As in *Alabama Realtors* and *Yates*, this Court must reject the Commission's primary claim that section 7(a)(1) of the Securities Act, 15 U.S.C. § 77g(a)(1), may be construed as authorizing any conceivable rule that the Commission should deem "necessary or appropriate." True, the text authorizes the Commission to make rules as it deems "necessary or appropriate in the public interest." But the text otherwise requires a

---

[9] Courts "rely on the principle of *noscitur a sociis*—a word is known by the company it keeps—to 'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to Acts of Congress.'" *Yates*, 574 U.S. at 543 (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995)). Likewise, the *expressio unius est exclusio alterius* canon counsels for a limiting construction when the text provides for specific examples and allows for additions with catch-all language. *See Bittner v. United States*, 598 U.S. 85, 94 (2023). There as well, the scope of the scope catch-all is informed by the overall context.

Appellate Case: 24-1626     Page: 47     Date Filed: 06/21/2024 Entry ID: 5406004

catalogue of very specific information, which clearly contextualizes the universe of topics Congress thought "necessary or appropriate" for securities regulation disclosures.

Schedule A, which is incorporated in section 7(a)(1), requires that registration statements must include information on the issuers' name; organizational jurisdiction; principal business office; names and addresses of management; underwriters; major shareholders, and counsel; nature of the business; capital stock amounts per class; outstanding funded debt; estimated net proceeds; proposed security offering price; promoter fees; major contracts; balance sheet; profit and loss statement; and articles of incorporation. *See* 15 U.S.C. § 77aa. The common thread is that all of these statutorily proscribed disclosures go to corporate performance or other matters that are obviously relevant to investors. As such, the Commission's authority to impose additional disclosure requirements under section 7(a)(1) must be understood as limited to similar matters of obvious financial relevance.

Nor does the Commission fare any better in pointing to any of the other delegations of authority to make rules "in the public interest or for the protection of investors" elsewhere in the Securities Act or the

37

Exchange Act.[10] There are many examples, throughout, of the sort of disclosure rules that Congress had in mind. And in each instance the examples confirm that Congress wanted disclosures of obvious relevance to financially focused investors. This clear and consistent financial focus points to the unavoidable conclusion that the Commission is limited to pursuing rules to ensure that investors have the information they need to adequately assess financial risks.

For example, the section 12(b) of the Exchange Act, 15 U.S.C. § 78*l*(b), lists registration requirements for securities and provides that the Commission may promulgate rules "in the public interest or for the protection of investors"—but only "in respect of" an enumerated list of

---

[10] For example, the Commission claims that it was authorized to promulgate the Climate Rule under section 10 of the Securities Act, 15 U.S.C. § 77j. This provision "generally requir[es] a prospectus to contain much of the same information contained in a registration statement[,]" but "grant[s] the Commission the authority to require additional information . . . as 'necessary or appropriate in the public interest or for the protection of investors.'" Climate Rule, 89 Fed. Reg. at 21,683, n.174. Therefore, the context makes clear that the Commission is limited to requiring disclosures similar to those enumerated, or incorporated, in the text of section 7(a)(1), 15 U.S.C. § 77g(a)(1).

disclosures that Congress deemed important.[11] 15 U.S.C. § 78*l*(b)(1). Here as well, the enumerated list makes clear the limited universe of permissible disclosure rules. For example, the Commission may make rules concerning required disclosures of: "bonus and profit-sharing arrangements"; "management and service contracts"; "balance sheets"; "profit and loss statements"; and "financial statements." *Id.* § 78*l*(b)(1)(F)–(L). All of this confirms that Congress granted the Commission authority to command disclosures that relate to the financial performance of a company. And the text removes all doubt in providing that the Commission's delegated authority to supplement Congress' enumerated list is limited to "further *financial statements* which the Commission may deem necessary or appropriate for the protection of investors." *Id.* § 78*l*(b)(1)(L) (emphasis added).[12]

---

[11] The Commission also claims that section 12(g), 15 U.S.C. § 78*l*(g), authorizes the Climate Disclosure rules; however, this provision pertains to exemptions from otherwise applicable registration requirements. But while section 12(g) authorizes the Commission to make exemptions "in the public interest," this cannot possibly authorize prospective climate disclosure rules like the Climate Rule's mandate that public companies must report greenhouse gas emissions.

[12] This necessarily limits the Commission to disclosure rules "relating to finance or financiers." *See Financial*, *Merriam*-Webster, https://www.merriam-webster.com/dictionary/financial (last visited June

Appellate Case: 24-1626    Page: 50    Date Filed: 06/21/2024 Entry ID: 5406004

Likewise, the surrounding text undercuts the Commission's claimed authority to impose financially irrelevant disclosure rules under section 13 of the Exchange Act, 15 U.S.C. § 78m(b)(1). Here, the Commission has delegated authority only to make rules "as necessary or appropriate for the proper protection of investors and to insure fair dealing . . . ." *Id.* at 78m(a). On its face, this delegation limits disclosures to those needed to avoid misleading investors. And while section 13 is littered with statements contemplating the Commission's authority to promulgate rules "in the public interest," the context clearly limits the Commission to "information and documents" pertaining to financially relevant matters. *Id.* at 78m(b)(1) (contemplating rules pertaining to the reporting of "balance sheet[s] and [] earnings statement[s]," "the appraisal or valuation of assets and liabilities," and similar matters of "internal accounting").

The Commission also relies on section 23 of the Exchange Act, 15 U.S.C. § 78w(a)(1). But here, the Commission's authority is limited to

13, 2024). *See also Finance, Merriam-Webster,* https://www.merriam-webster.com/dictionary/finance (last visited June 13, 2024) (defining "finance" as pertaining to the "[m]oney or liquid resources of . . . business").

making "rules and regulations as may be necessary or appropriate to implement" other provisions of the Exchange Act—i.e., rules needed to ensure the proper "execution of the [Commission's] functions." *Id.* Such a general housekeeping authority cannot be manipulated into a roving power to impose substantive rules.[13] *See Gonzales v. Oregon*, 546 U.S. 243, 259 (2006) (rejecting the Attorney General's claimed authority to establish standards of medical care under a general housekeeping provision; holding that the provision authorized only procedural rules, and could not be invoked to justify substantive rules); *id.* at 258 (stressing that the delegation only authorized regulation as needed for the Attorney General to "fulfill his duties"). And, in any event, it would be improper to assume that Congress intended to dramatically expand the scope of the Commission's powers in this provision, where the Act as a whole provides

---

[13] Similarly, the Commission points to Section 19(a) of the Securities Act, 15 U.S.C. § 77s(a), which grants "authority from time to time to make, amend, and rescind such rules and regulations as may be necessary to carry out the provisions of this subchapter[.]" But the text goes on to describe relevant financial information captured by this provision, including balance sheet items, earning statement details, account preparation methods, asset valuation, liabilities appraisals, depreciation and depletion determinations, and income differentiation. All of this undercuts the breadth of the SEC's claimed authority.

41

clear and consistent signals that Congress was laser focused on ensuring the disclosure of financially relevant information—and nothing more.[14] *See Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 412 (2011) (affirming that statutes should be construed, where possible, in a "coherent and consistent" manner).

### ii. Further Textual Confirmation That the Commission Has Limited Powers

Congress was also clear in limiting the Commission's authority elsewhere. The Exchange Act requires that whenever "the Commission is engaged in rulemaking and is required to consider or determine whether an action is necessary or appropriate in the public interest, the Commission shall also consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital

---

[14] In addition to the authorities discussed herein, the Commission has asserted authority under section 28 of the Securities Act, 15 U.S.C. § 78bb, and various provisions of the Exchange Act. Climate Rule, 89 Fed. Reg. at 21,912 (invoking Sections 3(b), 15 U.S.C. § 77c; section 15, 15 U.S.C. § 78o; and section 36, 15 U.S.C. § 78mm of the Exchange Act). But the Commission offers no explanation. And there is no plausible textual basis for relying on these code sections. If anything, the clear and consistent financial focus of the Securities Act and the Exchange Act foreclose any inference that Congress intended to authorize something as significant as climate change disclosures. *See Whitman*, 531 U.S. at 468 ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").

Appellate Case: 24-1626     Page: 53     Date Filed: 06/21/2024 Entry ID: 5406004

formation."[15] 15 U.S.C. § 77b(b). This confirms two things: (1) the authority to make rules "for the protection of investors" is limited to rules that will help investors better understand the financial risks of investment, and (2) the authority to make rules "in the public interest" is limited to rules that are otherwise "necessary or appropriate" to ensure healthy capital markets. And together the authority to impose disclosure rules "in the public interest, or for the protection of investors" is limited to the universe of financially relevant subjects.

But even without the express directive that the Commission must ensure its rules "promote efficiency, competition, and capital formation," the context of a statute molded in the fire of the Great Depression confirms that Congress did not intend to give the Commission the

---

[15] The Climate Rule does nothing to promote "efficiency, competition, and capital formation." On the contrary, the Rule undermines efficiency in imposing major burdens without any benefits to investors. And worse, it undermines market efficiency by burying investors in a sea of immaterial disclosures that obscure important matters. *See* 2010 Guidance, *supra* n.7 ("The Commission has recognized that the effectiveness of [disclosures] decrease[] with the accumulation of unnecessary detail or duplicative or uninformative disclosure that obscures material information."). Nor does the Climate Rule do anything to promote competition in the market. It serves only to manipulate natural market forces by incentivizing companies to adopt environmental reforms that may be economically inefficient. And while that may serve environmental goals, it does nothing to advance free market competition.

Appellate Case: 24-1626    Page: 54    Date Filed: 06/21/2024 Entry ID: 5406004

freewheeling powers it claims. That much is clear from Congress' findings as to the necessity of securities regulation in section 2 of the Exchange Act, 15 U.S.C. § 78b. Congress said that it was concerned with providing for regulation as needed to "remove impediments to and perfect the mechanisms of a national market system of securities . . . ." and as needed "to protect interstate commerce, the national credit, the Federal taxing power . . . the national banking system and Federal Reserve System, and to insure the maintenance of fair and honest markets . . . ." *Id.*

Congress was plainly concerned with regulating disclosures as needed "for determining and establishing the prices at which securities are bought and sold." *Id.* § 78b(2). Accordingly, Congress wanted regulation to prevent "manipulation" of prices and to deter "excessive speculation" that might cause "unreasonable fluctuations in the prices of securities" because that may have adverse effects on the economy. *Id.* § 78b(3). In all of this, Congress was focused on preventing another "[n]ational [economic] emergenc[y]." *Id.* § 78b(4). But not a word was said about the Commission's newly discovered need to enlighten investors on environmental and social governance matters.

44

As such, this Court must reject the Commission's claim to an unbounded power to compel climate disclosures (or anything else), just as the Supreme Court rejected the Department of Justice's claim that it could reach beyond "particular [financial] crisis" that had motivated Congress to enact a criminal prohibition on the destruction of financial records in the Sarbanes-Oxley Act. *Yates*, 574 U.S. at 535. Just as the Securities Laws were enacted to restore investor confidence in the wake of the stock market crash of 1929, the Sarbanes-Oxley Act was "legislation designed to protect investors and restore trust in financial markets" in the wake of the Enron crisis. *Id.* at 532.

As such, this Court must approach the Climate Rule "[m]indful that in [the Securities Act and the Exchange Act], Congress trained its attention on" ensuring investors would have the information they need to invest with confidence—just as the Court, in *Yates*, began its analysis "[m]indful that" the Sarbanes-Oxley Act was singularly focused on "corporate and accounting deception and coverups[.]" *Id.* And just as *Yates* held that it would be wrong to interpret critical language in manner that would "cut [that text] loose from [the statute's] financial-fraud mooring[,]" it would be wrong to interpret the Commission's delegated

45

authority in manner that would unmoor the text from Congress' manifest goal of restoring investor confidence. *Id.* At bottom, the Commission's delegated authority—as broad as it might appear when read in isolation—must be read in the context of a securities statute aimed at minimizing financial risks for investors, not as a blank-check for any three commissioners to pursue rules as happen to serve their worldview.

Likewise, *Alabama Realtors* confirms this commonsense approach. The Supreme Court said, "[i]t strains credulity to believe that" a statute designed to control the spread of contagious disease should be construed as "grant[ing] the CDC the sweeping authority" to issue a nationwide eviction moratorium or any other order that might tangentially mitigate the risk of interstate transmission of disease. 594 U.S. at 760. And the same is true here where the Commission invokes a statute designed to restore investor confidence and ensure healthy capital markets in pursuit of environmental and social governance disclosures that have only a tenuous connection, if any, to Congress' goal of helping investors understand financial risks.

Appellate Case: 24-1626    Page: 57    Date Filed: 06/21/2024 Entry ID: 5406004

### 2. The Commission's Interpretation Unreasonably Transforms Its Authority into an Ungoverned and Limitless Power

Even if there is ambiguity in the text (there is not), this Court should hold that that Commission has exceeded its statutory authority because it is unreasonable to stretch the Commission's delegated authority so elastically as to allow for rules mandating disclosure of financially irrelevant environmental and social governance disclosures. There are three reasons to conclude that the Commission's interpretation is unreasonable. Therefore, the Commission deserves no deference in its self-aggrandizing view of its powers. *See U.S. ex rel. O'Keefe v. McDonnell Douglas Corp.*, 132 F.3d 1252, 1257 (8th Cir. 1998).

First, it would be unreasonable to interpret the Securities Act and the Exchange Act as authorizing disclosure rules on *any and every topic* because that would enable the Commission to drown investors in financially irrelevant information. *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448 (1976) (warning that securities laws should not be construed to compel disclosures that will "bury [] shareholders in an avalanche of trivial information."). The Commission's preexisting regulations *already* require disclosure of climate change or other environmental issues of concern to the extent that there is legitimate

47

financial risk to investors. *See* 2010 Guidance, *supra* at n.7. And the Commission already requires public companies to provide many other disclosures that investors must wade through when assessing the potential risks and rewards of investment. But the Securities Laws cannot be construed as allowing the Commission to pile on mountains of new and *financially irrelevant* disclosures because that would only serve to obfuscate important information that prudent investors need. *See* Troy A. Paredes, *Blinded by the Light: Information Overload and Its Consequences for Securities Regulation*, 81 Wash. U. L. Q. 417, 418–19 (2003) (observing that, at some point, compelled disclosures obfuscate more than they enlighten). And, of course, it would be patently unreasonable to construe the Commission's rulemaking authority so broadly as to undermine the very purpose of the Securities Laws.

Second, the Commission's elastic view of its powers is unreasonable because it is unlikely that Congress would delegate rulemaking authority without imposing limits. *See Alabama Realtors*, 594 U.S. at 764–65 (rejecting CDC's expansive view of its powers because it was "hard to see what" subjects would be "outside [its] reach"). It is only reasonable to assume that Congress would provide direction and meaningful

48

guardrails to prevent the Commission from veering into regulatory lanes that Congress had not intended. *See Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172–73 (2001) ("Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority."). And, mindful of the reality that the Commission is not accountable to the American people, there is even greater reason to assume that Congress would not intend to give a blank check of power.

Third, and relatedly, the Commission's interpretation should be rejected because it would deny any limiting principle. If accepted, the Commission's interpretation would allow for rules compelling disclosure on any political, social, or moral issue—or anything else that certain investors care about. *See infra* Section III. But it is never reasonable to construe a statute as delegating totally unfettered rulemaking discretion because separation of powers demands that there must always be a standard that limits and controls agency discretion. *See Whitman*, 531 U.S. at 472–73 (affirming that to be constitutional, a delegation must be governed by a textually grounded "intelligible principle").

49

As set forth in Section III, the Commission's interpretation would deny any intelligible principle to limit and channel his rulemaking discretion. As such, this Court should reject the Commission's interpretation because it raises serious constitutional doubt. *See Crowell v. Benson*, 285 U.S. 22, 62 (1932) (providing that courts should avoid "serious [constitutional doubt]" where possible). *See also Union Pac. R.R. Co. v. U.S. Dep't of Homeland Sec.*, 738 F.3d 885, 892–93 (8th Cir. 2013) (employing the avoidance canon).

**B.      The Major Questions Doctrine Forecloses the Commission's Claim to Long Unheralded Powers**

The Commission's claim of a sweeping power to impose any conceivable disclosure rule that some investors might like is also incompatible with the major questions doctrine. The Supreme Court has said that Congress must provide "clear authorization" for an agency to pursue regulation to address climate change concerns. *West Virginia*, 597 U.S. at 732. *See also UARG*, 573 U.S. at 324. But the Commission has pointed only to its nebulous authority to promulgate rules "in the public interest or for the protection of investors"—which is far from a clear statement that Congress authorized climate-change disclosures.

The major questions doctrine requires that Congress must speak

Appellate Case: 24-1626      Page: 61      Date Filed: 06/21/2024 Entry ID: 5406004

clearly if it wishes to delegate rulemaking authority on issues of "vast economic and political significance." *West Virginia*, 597 U.S. at 716. Accordingly, courts will not presume regulatory authority from oblique language when an agency asserts power to resolve a politically contentious national debate. *See*, *e.g.*, *Gonzales*, 546 U.S. at 267 (requiring a clear statement of authority for an assertion of regulatory power that would have cut-off an "'earnest and profound debate' across the country" over physician-assisted suicide) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 735 (1997)). For example, the Supreme Court recently applied the major questions doctrine in *Sackett v. EPA*, to reject an interpretation of the Clean Water Act that would have "tucked an important expansion to the reach of the [Act] into convoluted language in a relatively obscure provision concerning state permitting programs." 598 U.S. 651, 677 (2023).

The doctrine applies here because the Commission seeks to "transform" the authority Congress delegated to restore investor confidence in the aftermath of the stock market crash of 1929, into a never imagined power to confront climate change. *Nebraska*, 143 S. Ct. at 2369. Far from pursuing environmental goals, the Congress of the

Great Depression was focused on an economic crisis. *See* 15 U.S.C. § 78b(4). Nor could the Congress of the 1930s have anticipated the modern political debate over climate change policy. For this reason alone, it is unreasonable to assume that the delegation of authority to regulate "in the public interest or for the protection of investors" was intended to authorize climate-change focused disclosures.

For that matter, federal agencies cannot rely on nebulous language in "long extant statute[s]" as authority to confront climate change with novel regulation because the question of how the United States should respond to climate change remains one of the most politically fraught questions of our day. *West Virginia*, 597 U.S. at 724. This is clear from *UARG* and *West Virginia*. In both cases, the Supreme Court applied the major questions doctrine when confronting claims that the Environmental Protection Agency could elastically stretch its authority under the Clean Air Act of 1963 to create novel schemes to reduce greenhouse gas emissions in the 21st Century. *UARG*, 573 U.S. at 324 (concluding that regulation of greenhouse gas emissions was a matter of "vast 'economic and political significance'" that requires a clear statement from Congress); *West Virginia*, 597 U.S. 697, 722 (applying the major

Appellate Case: 24-1626     Page: 63     Date Filed: 06/21/2024 Entry ID: 5406004

questions doctrine in rejecting a "colorable textual" interpretation that the EPA could compel energy producers to shift away from coal). And, in this case, the Commission advances an even more audacious claim that a far older statute—concerning the health of our financial markets—can be stretched to justify climate change responsive regulation.

The Commission cannot side-step the major questions doctrine by arguing that the Climate Rule's disclosure requirements are different from the substantive regulations at issue in *UARG* and *West Virginia*. At bottom the Climate Rule is an attempt to confront the perceived problem of climate change under the guise of securities regulation.[16] But the presumption is that Congress will speak clearly if it wants to authorize *any* regulatory response climate change. *See West Virginia*, 597 U.S. at 731 (emphasizing legislative history demonstrating Congress' reticence

---

[16] It would also be wrong—perhaps wildly wrong—to assume that the Climate Rule will not affect corporate behavior. As noted above, these new disclosure rules will impose pressure on corporate boards to institutionalize climate change concerns as a priority. If companies are compelled to report their greenhouse gas emissions, they will likely feel compelled to pursue measures to reduce their emissions to avoid negative media attention. Likewise, if companies are compelled to report whether they have adopted goals for confronting climate change, corporations will feel pressure to change the way they do business.

53

to impose regulation to address climate change).[17] And the fact is that Congress has balked at calls for legislation to compel climate-change disclosures, just as it has balked at calls for cap-and-trade regulation or other aggressive responses to climate change.[18]

And there is yet another reason to employ the major questions doctrine. The real problem is that the Commission is asserting a limitless view of its powers that is fundamentally inconsistent with separation of powers. *See West Virginia*, 597 U.S. at 737 (Gorsuch, J., concurring) (observing "[t]he major questions doctrine works in much the same way to protect the Constitution's separation of powers."). After all, the Commission is not just asserting power to confront climate change; it is asserting power to compel politically sensitive disclosures on non-

---

[17] *See also Nebraska*, 143 S. Ct. at 2380 (Barrett, J., concurring) (emphasizing that the "expectation of clarity is rooted in the basic premise that Congress normally 'intends to make major policy decisions itself, not leave those decisions to agencies.'") (quoting *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 419 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc)).

[18] *See* S. 3481, 115th Cong. (2018); S. 2075, 116th Cong. (2019); H.R. Rep. No. 116-563 (2020); S. 1217, 117th Cong. (2021); H.R. Rep. No. 117-39 (2021).

Appellate Case: 24-1626    Page: 65    Date Filed: 06/21/2024 Entry ID: 5406004

financial matters of any subject—whenever any three Commissioners deem fit.

And the extreme scope of the Commission's assertion of power matters because the major questions doctrine contemplates not only the specific rule at hand, but also the full implications of an agency's self-aggrandizing view of its powers. For example, the Supreme Court applied the major questions doctrine in *Gonzales*, in part, because if the Court had endorsed the Attorney General's elastic view of his powers, he could do far more than ban euthanasia. 546 U.S. at 268 ("Under the Government's theory" the Attorney General "could [also] decide whether any particular drug may be used for any particular purpose . . . ."). The same is true here. The Commission views the textual authorization to regulate "in the public interest or for the protection of investors," as an "empty vessel" to be filled with whatever meaning it likes, such that it can pursue any regulatory agenda—even if that means meddling with other politically fraught regulatory subjects that should be, by right, the exclusive purview of Congress. *West Virginia*, 597 U.S. at 732.

Appellate Case: 24-1626     Page: 66     Date Filed: 06/21/2024 Entry ID: 5406004

## III. No Intelligible Principle Governs the Commission's Claimed Rulemaking Authority

### A. The Nondelegation Doctrine Requires Congress Must Limit and Channel Rulemaking Discretion

The Constitution vests Congress with the exclusive power to make law because only Congress is directly accountable to the American People. U.S. Const. art. I, § 1. Thus, the Constitution forbids Congress from delegating its lawmaking powers. *See Whitman*, 531 U.S. at 472 (affirming the Vesting Clause prohibits any "delegation of [legislative] powers"). In this way, separation of powers ensures "democratic accountability." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 124 (2022) (Gorsuch, J., concurring).

Separation of powers demands that regulation promulgated by the Executive Branch must be governed by an objective standard—*i.e.*, law established by Congress. *See J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 405 (1928) (the Executive Branch must "conform" to law). Otherwise, "unaccountable 'ministers'" assume the role of lawmaker. *West Virginia*, 597 U.S. at 737 (Gorsuch, J., concurring). And that would frustrate our "constitutional design." *Gundy*, 139 S. Ct. at 2133 (Gorsuch, J., dissenting) (Congress cannot "announce vague aspirations and then

assign others the responsibility of adopting legislation to realize its goals").

For this reason, the nondelegation doctrine requires that Congress must provide an "intelligible principle" to *cabin* and *guide* the exercise of administrative discretion. *See Panama Refin.*, 293 U.S. at 430 ("As to the transportation of [hot oil] . . . Congress ha[d] declared no policy, [] established no standard, [] laid down no rule."). Of course, Congress can authorize executive officers and agencies to determine facts and can delegate "the duty to carry out [a] declared policy." *Id.* at 426. But Congress cannot "[leave] the matter to the [executive] without standard or rule, to be dealt with as he please[s]." *Id.* at 418. *See also Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825) (emphasizing that Congress must decide the "important subjects[.]").

Applying this constitutional standard, the Supreme Court famously ruled unconstitutional a provision of the National Industrial Recovery Act, in *Panama Refining*, because the provision delegated authority to outlaw the transportation of hot oil without providing a "definition of circumstances and conditions in which the transportation is to be allowed

57

or prohibited."[19] 293 U.S. at 430. Section 9(c) violated the nondelegation doctrine because nothing in the text governed President Roosevelt's exercise of discretion. The President was left free to weigh competing policy considerations as he deemed "fit." *Id.* at 415.

Later that same year, the Supreme Court declared the entire NIRA unlawful because the Act delegated "unfettered discretion" for the President to issue industry "codes" with whatever restrictions he thought "needed or advisable." *Schechter*, 295 U.S. at 537–38 (1935). The Court acknowledged that the President's delegated powers were not without limit. *Id.* For example, the NIRA prohibited the President from approving industry codes that would encourage monopolies or that would unduly suppress small business. *Id.* at 522–23. Even so, the NIRA violated the separation of powers because nothing in its text channeled the President's discretion in deciding what specific rules should govern the conditions of lawful employment or anything else. *Id.* at 538 (the NIRA's

---

[19] Historically, the judiciary narrowly construed delegations of rulemaking authority to avoid unlawful delegations of Congress' lawmaking powers. *See, e.g.*, *United States v. United Verde Copper Co.*, 196 U.S. 207, 215 (1905) (rejecting an interpretation that would enable a federal officer to "define" critical text).

Appellate Case: 24-1626    Page: 69    Date Filed: 06/21/2024 Entry ID: 5406004

restrictions left "virtually untouched . . . that wide field of legislative possibilities[.]").

*Panama Refining* and *Schechter* also rejected the Solicitor General's argument that an intelligible principle could be inferred from the statute's general statement of policy. Instead, the Court affirmed that an intelligible principle must be rooted in statutory text—rather than self-serving claims about the general purposes of the statute. *Panama Refin.*, 293 U.S. at 417–18; *Schechter*, 295 U.S. at 541–42. As such, the NIRA's hortatory goal of improving American economic conditions was insufficient.

**B.     There Is No Intelligible Principle Under the Commission's Interpretation of Its Powers**

**1.     If Unconstrained to Regulating Financially Relevant Matters, the Power to Make Rules in the "Public Interest" Is Limitless**

The authority to impose rules "in the public interest" is not an intelligible principle if the Commission is free to decide what serves the public interest without some objective standard rooted in the text. Of course, Congress has provided an objective standard because the text limits the Commission to compelling financially relevant disclosures that "promote efficiency, competition, and capital formation." 15 U.S.C.

59

§ 77b(b). *See Infra* Section II(A)(1)(ii). But the Commission disavows this limiting construction in asserting power to impose disclosure rules on any subject whenever certain investors begin to demand information relevant to their politicized objectives.

And the Commission's appeal to 'investor interest' is unavailing. For one, if Congress had intended to extend the Commission's rulemaking authority to cover financially irrelevant topics that certain investors may care about for social, political, or moral reasons, one would expect to see something in the text speaking to when or under what conditions "investor interest" should justify corporate disclosure rules. This is yet another reason to hesitate before accepting the Commission's free-wheeling view of its powers.

The fact that the Securities Laws require no findings of fact as to the level of investor interest requisite for imposition of financially irrelevant disclosure rules is not only problematic for the Commission's claimed authority; it is damning for the Commission's position on the nondelegation doctrine. The Supreme Court found a nondelegation violation in *Panama Refining* precisely because the NIRA left the President free to prohibit the interstate transport of hot oil without any

Appellate Case: 24-1626    Page: 71    Date Filed: 06/21/2024 Entry ID: 5406004

requirement that he should make any "finding" of fact. 293 U.S. at 415 ("Section 9(c) does not state whether or under what conditions the President is to prohibit [hot oil]. . . . It does not require any finding by the President as a condition of his action."). That was why the Court found there was no intelligible principle governing the President's exercise of discretion in deciding whether or when to prohibit hot oil.

As in *Panama Refining*, the Commission's interpretation would leave the Commission free to decide—without any textual direction— what level of investor demand should justify financially irrelevant disclosure rules. The Commission might decide that such rules are appropriate only when there is "pervasive" investor interest, or only when there is reason to believe that "many" investors want targeted non-financial information. Or the Commission might, just as well, compel disclosures whenever it finds that any significant number of investors want targeted information. For that matter, the Commission might also declare that it serves the public interest to require financially irrelevant disclosures if there is reason to believe that targeted information is of social or political concern within certain disadvantaged communities.

And, problematically, the Commission's interpretation would leave the commissioners free to wholly ignore investor demands for information (or not)—just as the NIRA left President Roosevelt free to ignore (or to take direction from) public demands either for or against his ban on hot oil. *See Panama Refin.*, 293 U.S. at 415 (observing the NIRA "establishes no criteria to govern the President's course."). The Commission might choose to give weight to certain investor demands (or not) based on its presumed power to choose between competing public values in deciding what rules will serve the public interest. But the weighing of "competing [public] values . . . is the very essence of legislative" judgment—at the heart of Congress' lawmaking power. *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987). *See also Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 382 (2023) (emphasizing that it is the role of lawmakers to weigh "incommensurable" values).

And in any event, investor interest cannot serve as an intelligible principle because if "[investor] interest alone [is] sufficient" to justify non-financially focused disclosure rules, "there is no end to the information

that [the Commission] [might] require [companies] to disclose . . . ."[20] *Am. Meat Inst. v. USDA*, 760 F.3d 18, 31–32 (D.C. Cir. 2014) (Kavanaugh, J., concurring). As the Supreme Court made clear in *Panama Refining*, a statute violates the intelligible principle test if Congress has given a blank check for the executive branch to do whatever it thinks "desirable." 293 U.S. at 421. And it is no answer for the Commission to say that its rulemaking authority is guided by investor interest because investors may take interest in any conceivable social or political issue—or entirely trivial matters.

Some investors care about whether companies are contributing to Planned Parenthood, or Earth Justice. Others care whether companies support or oppose LGBTQ policy objectives. Still, others care whether companies are prioritizing "equity" in the workplace, or embracing affirmative action, or whether they are taking a position in support of either side in the Israel-Gaza War. "[T]here is no end" to the number and

---

[20] Moreover, Congress cannot delegate power to impose disclosure rules based on the demands of certain politically motivated investors because that would allow private interests to commandeer Congress' lawmaking powers. For example, in *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936), the Supreme Court held that it was unconstitutional for a statute to make minimum wage and other labor standards contingent on the preferences of labor and industrial stakeholders.

variety of big social causes—whether consequential or faddish—that investors might want companies to embrace. *Am. Meat,* 760 F.3d at 31–32.

> **2. If Unconstrained to Detering Misleading Statements, the Power To Make Rules "For the Protection of Investors" Is Limitless**

Congress plainly intended to authorize rules as needed to protect investors from fraud or misleading information that might cause investors financial harm. But the Commission now seeks to contort its authority to protect investors into a roving power to pursue any rule it pleases. That cannot be. There is no limiting principle if the Commission is free to decide for itself that investors need protection from evils that Congress never contemplated.

Here the Commission has decided investors need disclosures to help protect against the perils of climate change, or against the risk that an investor might lend financial support to a company that is not doing enough to align with the investor's idiosyncratic views on corporate environmental responsibility. But, if that is a sufficient basis for the Climate Rule, the Commission might just as well assert that novel disclosures are needed to protect investors from companies that oppose

64

labor or employment policies that certain investors might favor. Or the Commission might decide that disclosures are needed to protect against any conceivable social problem for which investors want to see corporate action, or commitments, or condemnations. Here as well, "there is no end" to what rules the Commission might pursue if "for the protection of investors" is understood as "an empty vessel" to be filled with whatever meaning the Commission likes. *West Virginia*, 597 U.S. at 732.

### 3. *American Power & Light Co.* Is Easily Distinguishable

The Commission asserts that *American Power & Light Co. v. SEC*, 329 U.S. 90, 104 (1946), forecloses this nondelegation claim. Climate Rule, 89 Fed. Reg. at 21,686, n.218. It does not. In that case, Congress had specifically authorized the Commission to compel dissolution of certain holding companies where their structure was "unduly or unnecessarily complicate[d]" or the company "unfairly or inequitably distribute[d] voting power among security holders." *Am. Power & Light Co.*, 329 U.S. at 97. Both the legislative history and the text clarified that Congress established a policy aimed at pyramided holding companies, which limited the Commission's discretion. *Id.* at 103 (noting that it was "found in § 1(b)(3) that the national public interest . . . may be adversely

affected 'when control of such (subsidiary) companies is exerted through disproportionately small investment.'").

By contrast, nothing in the text of the Securities Act or the Exchange Act establish any policy governing the Commission's authority to promulgate rules "in the public interest or for the protection of investors" unless that authority is confined to disclosure rules on matters of obvious financial relevance. This should be reason enough to reject the Commission's view of its powers. But if accepted, the Commission's claim to sweeping rulemaking powers goes beyond anything that the Supreme Court has ever upheld before.

In the absence of any textually grounded governing standard, *Panama Refining Co.* and *Schechter* require that the delegation must be struck down. The only way to avoid that outcome is to reject the Commission's unbounded view of its rulemaking authority. As such, the Commission must be limited to compelling disclosures of financially relevant information. And it cannot stretch that power so elastically as to allow for any disclosure rules that certain investors might favor.

Appellate Case: 24-1626    Page: 77    Date Filed: 06/21/2024 Entry ID: 5406004

## CONCLUSION

For the foregoing reasons, the Petitioners respectfully request an order setting aside the Climate Rule as contrary to law.

DATED: June 21, 2024.

Respectfully submitted,

LUKE A. WAKE
RACHEL K. PAULOSE
Pacific Legal Foundation

By /s/ Luke A. Wake
    LUKE A WAKE
    Pacific Legal Foundation
    555 Capitol Mall, Ste. 1290
    Sacramento, CA 95814
    Telephone: (916) 419-7111
    LWake@pacificlegal.org

    RACHEL K. PAULOSE
    Pacific Legal Foundation
    3100 Clarendon Blvd., Ste. 1000
    Arlington, VA 22201
    Telephone: (202) 465-8734
    RPaulose@pacificlegal.org

*Counsel for Petitioners*

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

1.  This document complies with the word limit of Fed. R. App. P.
    32(a)(7)(B) because, excluding the parts of the document exempted
    by Fed. R. App. P. 32(f):

    **X**    this document contains **12,899** words, or

    this brief uses a monospaced typeface and contains [state the
    number of] lines of text.

2.  This document complies with the typeface requirements of Fed. R.
    App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P.
    32(a)(6) because:

    **X**    this document has been prepared in a proportionally spaced
    typeface using **Microsoft Word for Microsoft 365 in 14 pt.
    Century Schoolbook**, or

    this document has been prepared in a monospaced typeface
    using [state name and version of word-processing program]
    with [state number of characters per inch and name of type
    style].

3.  This brief and addendum have been scanned for viruses and are
    virus free.

    DATED: June 21, 2024.


                                        By /s/ Luke A. Wake
                                           LUKE A. WAKE
                                           *Counsel for Petitioners*

Appellate Case: 24-1626    Page: 79    Date Filed: 06/21/2024 Entry ID: 5406004

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

 /s/ Luke A. Wake
LUKE A. WAKE
*Counsel for Petitioners*
