_____

No. 24-1626
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT
_____

TEXAS ALLIANCE OF ENERGY PRODUCERS and
DOMESTIC ENERGY PRODUCERS ALLIANCE,

Petitioners,

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

Respondent,

DISTRICT OF COLUMBIA, ET AL.

Intervenors.
_____

Petition for Review of an Order of the Securities & Exchange
Commission
_____

**PETITIONERS' REPLY BRIEF**
_____

ADAM F. GRIFFIN
  Pacific Legal Foundation
  3100 Clarendon Blvd., Ste. 1000
  Arlington, VA 22201
  Telephone: (202) 888-6881
  Facsimile: (916) 419-7747
  AGriffin@pacificlegal.org

LUKE A. WAKE
  Pacific Legal Foundation
  555 Capitol Mall, Ste. 1290
  Sacramento, CA 95814
  Telephone: (916) 419-7111
  Facsimile: (916) 419-7747
  LWake@pacificlegal.org

*Counsel for Petitioners*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.......................................................................ii

INTRODUCTION...................................................................................1

ARGUMENT .........................................................................................2

I. The Climate Rule Compels Financially Irrelevant Disclosures ...........3

   A. Climate Change Risks Are Not Financial in Nature ......................4

   B. The Climate Rule Rejects Financial Relevance
      as a Limiting Constraint.................................................................9

II. The Commission Lacks Statutory Authority.....................................12

   A. The Commission's Uncabined View of
      Its Authority Violates the Canons of Construction......................12

   B. This Is a Major Questions Doctrine Case .....................................17

      1. The Climate Rule Transforms the
         Commission's Authority ...........................................................17

      2. There Is No Clear Statement Authorizing
         Nonfinancial Climate Disclosures............................................20

III. The Commission's Interpretation Violates
     the Nondelegation Doctrine ............................................................21

CONCLUSION .....................................................................................33

CERTIFICATE OF COMPLIANCE.......................................................34

CERTIFICATE OF SERVICE...............................................................35

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.L.A. Schechter Poultry Corp. v. United States,*
295 U.S. 495 (1935)......................................................22–23

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.,*
594 U.S. 758 (2021)......................................................14, 18

*Am. Meat Inst. v. USDA,*
760 F.3d 18 (D.C. Cir. 2014)..........................................24

*Am. Power & Light Co. v. SEC,*
329 U.S. 90 (1946).........................................................25

*Am. Sumatra Tobacco Corp. v. SEC,*
110 F.2d 117 (D.C. Cir. 1940).........................................28

*Bell Atl. Tel. Cos. v. FCC,*
24 F.3d 1441 (D.C. Cir. 1994).........................................16

*Bhatti v. Fed. Hous. Fin. Agency,*
15 F.4th 848 (8th Cir. 2021)...........................................27–28

*Biden v. Nebraska,*
143 S. Ct. 2355 (2023).....................................................3

*Big Time Vapes, Inc. v. FDA,*
963 F.3d 436 (5th Cir. 2020)...........................................24

*Bradford v. Dep't of Labor,*
101 F.4th 707 (10th Cir. 2024)........................................18

*Consumers' Rsch. v. FCC,*
109 F.4th 743 (5th Cir. 2024).........................................22– 24, 26

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
144 S. Ct. 2440 (2024)...................................................16

*CSX Transp., Inc. v. McBride,*
    564 U.S. 685 (2011) ................................................................. 32

*Davis Cnty. Solid Waste Mgmt. v. EPA,*
    108 F.3d 1454 (D.C. Cir. 1997) ......................................... 16

*Dyer v. SEC,*
    287 F.2d 773 (8th Cir. 1961) ............................................. 31

*Encino Motorcars, LLC v. Navarro,*
    584 U.S. 79 (2018) ................................................................. 14

*Fisher v. United States,*
    425 U.S. 391 (1976) ............................................................. 12

*Florida v. Dep't of Health and Hum. Servs.,*
    19 F.4th 1271 (11th Cir. 2021) ................................... 20–21

*Gonzales v. Oregon,*
    546 U.S. 243 (2022) ............................................................. 18

*Gundy v. United States,*
    588 U.S. 128 (2019) ............................................................. 26

*Int'l Union, United Auto., Aerospace & Agric. Implement
    Workers of Am., UAW v. OSHA,*
    938 F.2d 1310 (D.C. Cir. 1991) ......................................... 27

*Loper Bright Enters. v. Raimondo,*
    144 S. Ct. 2244 (2024) .................................................. 12–13

*Mistretta v. United States,*
    488 U.S. 361 (1989) ................................................... 7, 22, 26

*North Carolina v. EPA,*
    531 F.3d 896 (D.C. Cir. 2008) ......................................... 16

*Panama Ref. Co. v. Ryan,*
    293 U.S. 388 (1935) ............................................................. 23

*S. Dakota v. U.S. Dep't of Interior,*
    423 F.3d 790 (8th Cir. 2005) ............................... 6, 23, 30

*Scherer v. U.S. Forest Serv.*,
653 F.3d 1241 (10th Cir. 2011) ...................................... 16

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976) .............................................. 7, 9

*United States v. Lopez*,
514 U.S. 549 (1995) ............................................... 7

*United States v. White*,
97 F.4th 532 (7th Cir. 2024) ...................................... 19

*West Virginia v. EPA*,
597 U.S. 697 (2022) ........................................... 17, 20

*Whitman v. Am. Trucking Ass'n*,
531 U.S. 457 (2001) ....................................... 24, 28, 30

*Wright v. SEC*,
112 F.2d 89 (2d Cir. 1940) ....................................... 29

*Yakus v. United States*,
321 U.S. 414 (1944) .............................................. 27

*Yates v. United States*,
574 U.S. 528 (2015) .............................................. 14

## Statutes

5 U.S.C. § 706(2)(A) .............................................. 16

15 U.S.C. § 77aa(8) ........................................... 14–15

15 U.S.C. § 77aa(9) .............................................. 14

15 U.S.C. § 77aa(24) ............................................. 14

15 U.S.C. § 77b(b) ............................................... 23

15 U.S.C. § 78c(f) ............................................... 23

15 U.S.C. § 78*l*(b)(1)(I) ....................................... 14

15 U.S.C. § 78*l*(b)(1)(A) ............................................................... 14

15 U.S.C. § 78*l*(b)(1)(K) ............................................................... 14

## Regulations

17 C.F.R. § 229.1501(a) ................................................................ 10

17 C.F.R. § 229.1501(a)(1) ........................................................... 11

17 C.F.R. § 229.1501(a)(1)(ii) ...................................................... 10

17 C.F.R. § 229.1501(a)(1)(v) .................................................... 9, 11

17 C.F.R. § 229.1501(a)(v) ........................................................... 10

## Other Authorities

Commission Guidance Regarding Disclosure Related to
Climate Change (Feb. 2, 2010),
https://www.sec.gov/files/rules/interp/2010/33-9106.pdf ................... 4

Environmental and Social Disclosure,
40 Fed. Reg. 51,565 (Nov. 6, 1975) ...................................... 6

FOIA Update: OIP Guidance: Privacy "Glomarization,"
Office of Information Policy, U.S. Dept. of Justice
(Jan. 1, 1986), https://www.justice.gov/oip/blog/foia-
update-oip-guidance-privacy-glomarization ............................... 11–12

Hall, Matthew, *A Catastrophic Conundrum, But Not a
Nuisance: Why the Judicial Branch is Ill-Suited to Set
Emissions Restrictions on Domestic Energy Producers
Through the Common Law Nuisance Doctrine*,
13 Chap. L. Rev. 265 (2010) ................................................. 7

Keeton, W., et al., Prosser and Keeton on Law of Torts
(5th ed. 1984) ................................................................... 32

Uyeda, Mark, SEC Comm'r, A Climate Regulation under the
Commission's Seal: Dissenting Statement on the
Enhancement and Standardization of Climate-Related
Disclosures for Investors (Mar. 6, 2024) ..............................................4

**INTRODUCTION**

The Respondent and the Intervenors (collectively "Defendants")[1] assert that the Securities and Exchange Commission wields a breathtaking power to require disclosures on any conceivable subject simply because certain investors might believe targeted information "important" to their "voting decisions." *See* Resp't Br. at 51–54 ("SEC Br.") (arguing that "Congress rejected an approach limited" to financially relevant considerations); Intervenors Br. at 15 (claiming the text delegates a "purposely [] indefinite" rulemaking authority). In their view, the Commission need only decide—by a naked majority—that new disclosure rules will serve ***the agency's*** conception of "the public interest" or its evolving conception of investor "protect[ion]." *See* SEC Br. at 23, 51.

But the Commission cannot transform financially focused securities laws into a roving authority to advance political or social causes. The major questions doctrine precludes the Commission's novel regulatory response to climate change. And in any event, the Defendants

---

[1] The Petitioners are the Texas Alliance of Energy Producers and the Domestic Energy Producers Alliance (collectively "Alliance").

have no answer to the canons of construction—which clearly limit the Commission to regulating financially-relevant disclosures.

Moreover, the Defendants' interpretation should be rejected under the avoidance canon because the Commission's boundless view of its disclosure rulemaking authority would violate the nondelegation doctrine. The Defendants respond only by doubling-down on an assertion that the securities laws embrace a philosophy of full disclosure. But there is no intelligible principle if the Commission's disclosure rulemaking authority extends beyond the canalized concept of financial relevance.

## ARGUMENT

The Climate Rule is environmental policy masquerading as financial policy.[2] It compels industry to produce financially irrelevant (*i.e.*, immaterial) information for a political or social agenda. But the Commission has no business regulating financially irrelevant information.

And the Commission's authority cannot be stretched to enable disclosure regulation to address social and political concerns without

---

[2] *See* The Enhancement and Standardization of Climate-Related Disclosures for Investors, App. 441 ("Climate Rule").

crossing the Rubicon. If accepted, the Commission's interpretation would do more than transform its regulatory powers. It would violate the nondelegation doctrine.

## I. The Climate Rule Compels Financially Irrelevant Disclosures

The Defendants insist that there is nothing remarkable about the Climate Rule. They claim that the Rule merely "elicit[s] disclosure of factual information directly relevant to the value of investments in public companies." SEC Br. at 1. As such, they argue that the "petitioners attack a strawman . . . [because the Rule] is not about climate change or environmental policy; it is about protecting investors." SEC Br. at 2.

But Defendants stretch the concept of financial relevance to consume non-financial environmental concerns. And the Defendants admit that the Rule imposes blanket disclosure obligations that are ***not limited*** to financially relevant information. Accordingly, the Commission is operating outside its financial wheelhouse. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2382 (2023) (Barrett, J., concurring) ("Another telltale sign that an agency may have transgressed its statutory authority is when it regulates outside its wheelhouse.").

## A. Climate Change Risks Are Not Financial in Nature

The Defendants insist that the Commission is "agnostic" on climate change regulatory policy. SEC Br. at 19, 42, 78. But there is good reason for skepticism. After all, the Commission *already* requires disclosures of material risks. *See* Commission Guidance Regarding Disclosure Related to Climate Change (Feb. 2, 2010).[3] This suggests that the Rule is about combatting climate change.[4] Moreover, the Commission admits the Climate Rule was modeled, in part, on recommendations of the Task Force on Climate-Related Financial Disclosures—which has been transparent in urging climate-related disclosure rules to encourage a transition to a lower carbon economy. Climate Rule, App. 446 (acknowledging that the Task Force was focused on "evaluat[ing] ways . . . the financial sector could address climate-related concerns.").

But what matters is the substance of the Climate Rule. While the Defendants claim that the Rule is merely about addressing "material impacts from climate-change risks[,]" SEC Br. at 14, the Rule says

---

[3] https://www.sec.gov/files/rules/interp/2010/33-9106.pdf.
[4] *See* Mark Uyeda, SEC Comm'r, A Climate Regulation under the Commission's Seal: Dissenting Statement on the Enhancement and Standardization of Climate-Related Disclosures for Investors (Mar. 6, 2024).

otherwise. The regulatory text confirms that the Commission's sweeping disclosure requirements will compel disclosure of information of no financial relevance.

The Defendants stress that many of the Commission's climate-change rules are conditioned on a materiality qualifier. SEC Br. at 50. But this is misleading. The materiality qualifier is meaningless where the Commission's rules go on to specify that disclosure is mandatory for climate-related risks to a company's "strategy" or its "operations" that have no obvious bearing on the company's "financial condition." *See* Alliance Br. at 27–28.

In response, the Defendants double-down on their assertion that investors want systematized disclosures to help them make better investment and voting decisions. *See* SEC Br. at 36–37. But they have no answer to Petitioners' core argument that "the Commission can [] compel disclosure of risks affecting a company's 'strategy' and 'operations,' [] only when there [is] reason to believe that such risks ultimately translate into financial risks . . . ." Alliance Br. at 28. After all, if supposed climate-change risks do not bear on the company's projected financial performance, it is only conceivably relevant for investors who seek that

information for non-financial reasons—*i.e.*, to achieve social or political goals.

True, the Commission decided that investors want information about climate-related risks to inform their decisions. *See* SEC Br. at 39 (repeating the assertion that the Climate Rule will "elicit more complete disclosure of financial statement effects . . . ."). But the Commission cannot ***stretch the concept*** of financial relevance to the point of extending its authority to regulate financially irrelevant disclosures.[5] And this Court must reject any such interpretation—under the avoidance canon—because it would empower the Commission to decide the scope of its own powers, in violation of the nondelegation doctrine. *See Supra* at 21-32. *See also S. Dakota v. U.S. Dep't of Interior*, 423 F.3d 790, 797 (8th Cir. 2005) (stating that when confronted with a nondelegation argument, this Court "will, if possible, give 'narrow constructions to statutory

---

[5] This is an especially dubious proposition given that the Commission disavowed any claim to such authority in 1975. Environmental and Social Disclosure, 40 Fed. Reg. 51,565, 51,660 (Nov. 6, 1975) (stating that the agency lacks authority to "require disclosure for the sole purpose of promoting social goals unrelated to those underlying" the Securities and Exchange Acts.).

delegations[.]'") (quoting *Mistretta v. United States*, 488 U.S. 361, 373 n.7 (1989)).

At bottom, Defendants are wrong in their assertion that climate-related risks are financial risks. To the extent climate change poses "risks," those are macro-level societal concerns for Congress to sort out—not company-specific risks. Just as it is impossible to pin any "individual emitter of carbon dioxide" to "sea level rise[,]"[6] it is impossible to say that the phenomena of climate change is manifesting predictable financial consequences for any specific company without "pil[ing] inference upon inference in a manner that would bid fair to convert [the Commission's statutory authority] to a general police power" for all conceivable disclosures. *United States v. Lopez*, 514 U.S. 549, 549–50 (1995). The macro impacts of climate phenomena—unfolding at a glacial pace over many decades and centuries—bears only a hyper-attenuated connection (if any) to the sort of concrete financial concerns at the heart of the securities laws. *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438,

---

[6] Matthew Hall, *A Catastrophic Conundrum, But Not a Nuisance: Why the Judicial Branch is Ill-Suited to Set Emissions Restrictions on Domestic Energy Producers Through the Common Law Nuisance Doctrine*, 13 Chap. L. Rev. 265, 275 (2010).

448–49 (1976) (emphasizing that securities laws cannot be stretched to bury investors in trivial information).

On this point, the Intervenors misconceive the Petitioners' argument. They say the Alliance has admitted climate-related risks are within the legitimate sweep of the Commission's rulemaking authority. Intervenors Br. at 26–27 (citing Alliance Br. at 26–29). Of course, it is true that in *special circumstances* a company's emissions may have bearing on its financial outlook. But in that case, the company already has a *preexisting existing* obligation to report issues of material concern. For example, the environment-related disclosures cited by Defendants, SEC Br. at 48–49, pertain directly to a company's financial outlook because they are limited to "compliance with statutory requirements with respect to environmental quality." *Id.* at 48. By contrast, the Commission now seeks to compel sweeping disclosures on all manner of speculative climate-related risks that bear, at best, a tenuous relation to financial risks.

## B. The Climate Rule Rejects Financial Relevance as a Limiting Constraint

The Defendants admit that the Climate Rule compels blanket disclosures without any "materiality qualifiers." *E.g.*, SEC Br. at 3 (stressing that the Commission "added materiality qualifiers, limiting ***most*** [but not all] of the disclosures. . . .") (emphasis added). For example, the Climate Rule includes mandatory disclosures as to "[w]hether and how the board of directors sets climate-related targets or goals . . ." 17 C.F.R. § 229.1501(a)(1)(v). But in the absence of a materiality qualifier, these blanket rules compel disclosures regardless of whether the information elicited is relevant to financially focused investors. *But see Northway*, 426 U.S. at 445 (grounding disclosure requirements in an "objective" understanding of whether information is of financial "significance"). These requirements to disclose immaterial non-financial information pertaining to climate change are well beyond the scope of the Commission's authority.

The Commission suggests that companies are only required to make corporate governance disclosures when "management plays a role in assessing and managing climate-related risks[.]" SEC Br. at 15. But the regulatory text requires—without qualification—that companies

must "[d]escribe [their] board of directors' oversight of climate-related risks." 17 C.F.R. § 229.1501(a). This necessarily compels a response.

The Rule does not allow the company to remain silent—even if a company has determined that it faces no financially relevant climate related risks. Indeed, in mandating that the company must "[d]escribe" its corporate "oversight of climate-related risks[,]" the Commission thrusts a choice on every public company: Either explain how their Board oversees climate related risks, or state that their Board *does not* monitor climate issues.

The Climate Rule contains numerous disclosure requirements that care not a whit for materiality. For example, the Rule requires disclosure of "[w]hether any member of the board of directors has expertise in climate-related risks" without a materiality qualifier. 17 C.F.R. § 229.1501(a)(1)(ii). And there is no materiality qualifier in the requirement that companies must disclose "[w]hether and how the board of directors sets climate-related targets or goals . . . ." *Id.* § 229.1501(a)(v). The Rule simply demands a response as to whether or not the Board is doing anything on climate-related matters.

It is no answer for the Commission to say that these disclosures are only required "as applicable" because reporting companies are compelled to communicate something one way or the next.[7] Even if there is nothing applicable to report, that response still conveys information. Just as a requirement to report the existence of any applicable documents constitutes an admission either that targeted documents exist or a representation that they do not, a statement that there is nothing applicable to report under Subsection 229.1501(a)(1)(i)–(v) speaks to the fact that the company has declined to prioritize climate-change concerns—even if those concerns are not financially relevant. *See e.g.*, FOIA Update: OIP Guidance: Privacy "Glomarization," Office of Information Policy, U.S. Dep't of Justice (Jan. 1, 1986) (stating that in some instances federal agencies may respond to a Freedom of Information Act request by neither confirming nor denying the existence of the information sought because to either confirm or to deny the existence of such documents would "in and of itself, reveal [sensitive]

---

[7] In any event, the overarching requirement to "[d]escribe the board's "oversight of climate-related risks" is not qualified by the "as applicable" language. 17 C.F.R. § 229.1501(a)(1).

information.").[8] *Cf. Fisher v. United States*, 425 U.S. 391, 410 (1976) (explaining that the "act of producing evidence in response to [a demand]" is in itself "communicative.").

## II. The Commission Lacks Statutory Authority

### A. The Commission's Uncabined View of Its Authority Violates the Canons of Construction

The Defendants insist that "the Securities Act and the Exchange Act contain no [] limitation" restricting the Commission's disclosure rules to material (i.e., financially relevant) disclosures. SEC Br. at 53. In their view, the Commission is acting "within the bounds of its discretion"—notwithstanding the fact the Climate Rule compels financially irrelevant disclosures, at least "under [certain] facts and circumstances." *Id.* at 52–53. This argument is premised on the errant view that the express delegation to make rules "in the public interest, or for the protection of investors" gives the Commission power to "fill up the details" of the statutory scheme however it deems fit. *Id.* at 28. But the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, unequivocally rejected any approach to statutory construction that "mechanically

---

[8] https://www.justice.gov/oip/blog/foia-update-oip-guidance-privacy-glomarization.

afford[s] binding deference to agency interpretations . . . ." 144 S. Ct. 2244, 2265 (2024).

The fact that Congress expressly delegated rulemaking authority does not give license for the Commission to decide that *any* disclosure rule it likes is in the "public interest, or for the protection of investors." Those terms have objective meaning—grounded in statutory context. *Id.* at 2266 ("Courts [] understand that [] statutes, no matter how impenetrable . . . have a single, best meaning."). In the context of securities regulation, investors need "protection" only from misleading statements, and the "public interest" is concerned only with the maintenance of healthy capital markets—which requires financially relevant disclosures. The Commission is confined to operating within that objective meaning. *Id.* at 2266 (confirming that courts are tasked with determining the scope of the agency's delegated authority by looking at the statute as a whole—using all the tools of construction—to give ambiguous text the "best reading").

And the Defendants have no answer to the Petitioners' canons of construction arguments.[9] As the Alliance has already argued, this Court should reject the Commission's elastic interpretation of its authority for the same reasons the Supreme Court rejected expansive statutory interpretations in *Yates v. United States*, 574 U.S. 528 (2015), and *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758 (2021). Alliance Br. at 33–37. But the Defendants ignore *Yates* and do not confront the textual analysis in *Alabama Realtors*.

Ultimately, the Defendants concede that the Commission's delegated authority must be understood as authorizing rules "of 'like kind'" to the examples of disclosures that Congress expressly enumerated. Intervenors Br. at 15. For example, the Respondent claims that the Climate Rule requires disclosures that are similar in nature to the statute's enumerated requirements to disclose:

- [T]he "general character of the business," 15 U.S.C. § 77aa(8);

---

[9] They argue only that phrases like "in the public interest" and "for the protection of investors" should be interpreted mindful of the statute's purpose to guarantee "full disclosure" to investors. SEC Br. at 29–30. But the statutory purpose is expressed in the text. *See Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 88–89 (2018).

- [T]he issuer's "capitalization," *id.* 77aa(9);

- [I]ts outstanding debts, *id.*;

- "[E]very material contract made[] not in the ordinary course of business," including "every material patent," *id.* 77aa(24);

- "[T]he organization, financial structure, and nature of the business," *id.* 78*l*(b)(1)(A),

- "[P]rofit and loss statements," *id.* 78*l*(b)(1)(K), and;

- "[M]aterial contracts[] not made in the ordinary course of business," *id.* 78*l*(b)(1)(I),

SEC Br. at 31–32.

But the contrast between this enumerated list and the Climate Rule is stark. It only confirms Petitioners' point that the Climate Rule is *unlike* these enumerated disclosures. Alliance Br. at 33–42. Every enumerated item is of obvious financial relevance, in the traditional sense. By contrast, the Climate Rule pertains to political and social policy.[10]

---

[10] The enumerated requirements to disclose the company's financial condition, capitalization, outstanding debts, and its profit and loss statement are plainly relevant to any rational assessment of the risks and rewards of investment—just as is information about material contracts and patents. Likewise, disclosures about the general character of a business are relevant in assessing the potential for profit or loss. By

Finally, as a last redoubt, the Intervenors argue that the Climate Rule must withstand scrutiny because the Rule might prompt disclosure of financially relevant information in some instances. Intervenors Br. at 23, 26. But the Climate Rule is categorically beyond the Commission's authority, *Infra* at 9–12, because "every time" the agency requires an immaterial corporate disclosure "it exceeds its statutory authority." *Scherer v. U.S. Forest Serv.*, 653 F.3d 1241, 1244 (10th Cir. 2011) (emphasis omitted).

As such, the Climate Rule is unlawful agency action and must be "set aside." 5 U.S.C. § 706(2)(A). This means the Rule must be "vacated" in its totality.[11] *See Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2462–63 (2024) (Kavanaugh, J, concurring).

---

contrast, information about whether a company is setting climate related goals does not, in itself, bear on the company's financial outlook.

[11] The Climate Rule is unlawful in its entirety. *Infra* at 5–9. And in any event, this Court should set aside any portion of the rule for which there is substantial doubt as to whether the Commission has stretched the concept of materiality. *See Davis Cnty. Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1459 (D.C. Cir. 1997) (stating that "[s]everence and affirmance of a portion of an administrative regulation is improper if there is 'substantial doubt' that the agency would have adopted the severed portion on its own.") (quoting *Bell Atl. Tel. Cos. v. FCC*, 24 F.3d 1441, 1447 (D.C. Cir. 1994). *E.g.*, *North Carolina v. EPA*, 531 F.3d 896, 929 (D.C. Cir. 2008) (declining to "pick and choose" which portions of a rule to preserve).

### B. This Is a Major Questions Doctrine Case

#### 1. The Climate Rule Transforms the Commission's Authority

The Defendants argue that this is not a major questions case because the Climate Rule is "consistent with the Commission's longstanding administration of its disclosure regime . . . ." SEC Br. at 54–55 (asserting this is not an "unheralded power"); *see also* Intervenors Br. at 29. But the Climate Rule *is* new and novel. Unlike the Commission's existing regulations, the Rule compels financially-irrelevant disclosures. And again, climate change risks are not financial risks. *Infra* at 5–9.

The Supreme Court has consistently applied the major questions doctrine in cases where federal agencies have asserted novel regulatory powers in response to climate change. *E.g.*, *West Virginia v. EPA*, 597 U.S. 697, 711–12, 727 (2022) (applying the doctrine to a rule designed to combat climate change). And it is appropriate to apply the doctrine here because there is an ongoing debate between opposing factions in Congress on whether and to what extent companies should be required to make climate change related disclosures.[12] Indeed, the Defendants

---

[12] The fact that the Rule deviates to some degree from congressional bills does not change the fact that there is a simmering debate. And the fact

have no answer to *Gonzales v. Oregon*, 546 U.S. 243, 267–68 (2022), which made clear the doctrine requires a clear statement of authority when an agency asserts rulemaking authority over an issue subject to a deeply divided, ongoing national debate. *See* Alliance Br. at 51.

The Defendants next argue that the doctrine should not apply because the Commission has "expertise and experience in finance, accounting, and risk assessment." Intervenors Br. at 30; *see also* SEC Br. at 56. But the Commission does not have *political expertise*. The major questions doctrine affirms that it is for Congress (not the agency), to weigh the competing values at issue here. *Ala. Realtors*, 594 U.S. at 764.

The Defendants' reliance on *Bradford v. Department of Labor*, 101 F.4th 707 (10th Cir. 2024), is misplaced. *Bradford* rejected a major questions doctrine argument in the context of a case challenging a long-standing agency interpretation. *Bradford*, 101 F.4th at 727. But the Commission has never previously interpreted its authority so elastically as to compel financially irrelevant information—especially on an issue of such political salience. *See Ala. Realtors*, 594 U.S. at 764.

---

Congress could not muster votes to repudiate the Climate Rule only goes to the fact that this remains an issue of heightened political concern.

Unlike every previous disclosure rule, the Climate Rule compels financially irrelevant information to aid politically motivated investors.[13] For example, the Commission's preexisting environmental disclosure rules were limited to material—*i.e.*, financially relevant—information. But the Climate Rule extends beyond financial relevance into climate policy and imposes disclosure requirements without materiality qualifiers. *See Infra* at 3–12.

Likewise, the Commission's existing regulations target information of obvious financial relevance in requiring companies to provide a "'discussion of the principal factors that make [an] offer speculative or one of high risk.'" SEC Br. at 34. The same is true of the Commission's regulations requiring companies to provide a narrative of their financial performance, and to report "all material advisory, construction and service contracts." SEC Br. at 33. This sort of information is inherently valuable to financially focused investors—in stark contrast to financially

---

[13] *United States v. White*, 97 F.4th 532, 539–41 (7th Cir. 2024), is inapposite. In that case, the Executive Branch was claiming a routine authority consistent with longstanding practice. But here, the Commission has imposed a rule unlike any it has issued before.

irrelevant information like whether a company has set climate focused goals.[14]

### 2. There Is No Clear Statement Authorizing Nonfinancial Climate Disclosures

The Defendants also argue they should prevail—even under the major questions doctrine—because "the Securities Act and the Exchange Act expressly delegate authority to the Commission to establish 'rules or regulations' requiring disclosure of information 'necessary or appropriate in the public interest or for the protection of investors, . . . .'" SEC Br. at 58. But such nebulous authority is far from the sort of "clear statement" that the Supreme Court has required in major questions doctrine cases. *See West Virginia*, 597 U.S. at 732 (finding no clear authorization for a rule, even though the agency's construction was within the "definitional possibilities" of the operative text).

And *Florida v. Department of Health and Human Services*, 19 F.4th 1271 (11th Cir. 2021), does not help the Defendants. In that case, the

---

[14] The Defendants point to other examples of prior regulation. *See* SEC Br. at 32–33. But they are of obvious financial relevance. For example, a regulation requiring disclosures of company oversight on cyber security risks is unquestionably financially relevant because data breaches can result in major disruptions and liabilities for any company.

Secretary of Health and Human Services issued an interim rule that required certain healthcare facilities to ensure that their staff was fully vaccinated against COVID-19. *Id.* at 1275. The Secretary was empowered to make rules for the "administration" of Medicare and Medicaid and the "health and safety" of recipients. And a vaccine requirement was plainly calibrated to ensure the "health and safety" of patients. *Id.* at 1287. By contrast, here the statutes govern disclosures in the financial context; however, the Climate Rule is focused on an environmental issue with, at best, a highly tenuous connection to any financial concern.

## III. The Commission's Interpretation Violates the Nondelegation Doctrine

The Defendants assert that the Petitioners' nondelegation claim is "baseless[.]" SEC Br. at 59. Yet, they cannot point to any governing intelligible principle under their elastic view of the Commission's authority. They point only to the nebulous delegation to make rules as "necessary or appropriate in the public interest or for the protection of investors." *Id.* at 61.

As the Fifth Circuit recently affirmed, *en banc*, the intelligible principle test requires more than a rote invocation of nebulous text; the statute must provide an objective standard under which a reviewing

court can "ascertain whether the will of Congress has been obeyed." *Consumers' Rsch. v. FCC*, 109 F.4th 743, 761 (5th Cir. 2024) ("*Consumers' Research*") (quoting *Mistretta*, 488 U.S. at 379). In *Consumers' Research*, the Fifth Circuit rejected the government's arguments that the Telecommunications Act supplied an intelligible principle, in providing that "universal service" funding should be "sufficient . . .to preserve and advance universal service" and that services "should be available at . . . affordable rates." *Id.* at 760. Nor was the undefined "concept of universal service" an intelligible principle—notwithstanding that the text "supplie[d] [at least] minimal guidance on the contours of Congress's idea of an ideal universal service . . . ." *Id.* And, as in *Consumers' Research*, the nebulous delegation of authority to make rules "in the public interest, or for the protection of investors" is insufficient here because—if that text can justify more than just financially irrelevant disclosures—it is a "mystery" how any court can say whether the Commission has conformed to Congress' will. *Id.* at 761.

Rather than explain how the text governs the Commission's discretion, the Defendants pivot to an assertion that the "context, purpose, and history' of the Securities Act and the Exchange Act" furnish

an intelligible principle. SEC Br. at 61. But Eighth Circuit precedent limits this Court to "look[ing] solely to the language and the context of the statute in determining its constitutionality." *S. Dakota*, 423 F.3d at 796. And the Defendants' appeal to "Congress' objectives[,]" SEC Br. at 29, is unavailing because the Supreme Court expressly rejected the argument that the court should infer an intelligible principle from the National Industrial Recovery Act's general statements of policy. *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 417–18 (1935); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 534–36, 541–42 (1935).

The Defendants argue that there is an intelligible principle in the statutory requirement to "consider, in addition to the protection of investors, whether [a rule] will promote efficiency, competition, and capital formation." SEC Br. at 62 (citing 15 U.S.C. §§ 77b(b), 78c(f)). But as Petitioners explained already, the Commission disavows this limiting construction in asserting power to compel disclosures for the sake of aiding investors in politically minded voting decisions. Alliance Br. at 59. If the Commission can deem a rule to serve these values simply because certain investors say they want targeted information, then it cannot serve as an objective intelligible principle. *See Consumers' Rsch.*, 109

F.4th at 759 (affirming courts should not simply "rubber-stamp" delegations without searching for objective limitations in the statutory text) (quoting *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 443 (5th Cir. 2020). After all, "there is no end" to the information investors might demand if the Commission can go beyond regulating financially relevant disclosures. *Am. Meat Inst. v. USDA*, 760 F.3d 18, 31–32 (D.C. Cir. 2014) (Kavanaugh, J., concurring).

Because the Defendants cannot point to any limiting principle under their view of the Commission's powers, this case is on all fours with *Panama Refining* and *Schechter. See Consumers' Rsch.*, 109 F.4th at 761, 764 (finding no intelligible principle where the text of the Telecommunications Act left the agency free to "roam at will," in making "policy judgments, not technical ones.") (internal citations omitted). They argue those cases were different because Congress "provid[ed] literally no guidance for the exercise of discretion." SEC Br. at 60 (quoting *Am. Trucking*, 531 U.S. at 474). But again, Defendants cannot locate any textual limit for what subjects are beyond the Commission's disclosure authority or for addressing when the Commission cannot compel financially-irrelevant political information. *See* Alliance Br. at 60

(observing that, like the NIRA, the Securities Act and the Exchange Act requires "no findings of fact as to the level of investor interest requisite for imposition of financially irrelevant disclosure rules . . . ."). After all, if the Commission can require disclosure of financially irrelevant information simply because certain investors want it to advance their social or political goals, then the Commission can require disclosure of any information, in any context, without limit.

Grasping for straws, the Defendants invoke *American Power & Light Co. v. SEC*, 329 U.S. 90, 104–05 (1946). They argue that "[i]n the securities context . . . the Supreme Court upheld provisions authorizing the Commission to ensure that a holding company's structure does not 'unfairly or inequitably distribute voting power among security holders.'" SEC Br. at 60. But as Petitioners have already explained, *Am. Power & Light* is distinguishable because, in that case, both the legislative history and the **text** clarified that the statute was targeting pyramided holding companies. *See* Alliance Br. at 64–65. That was not a case of unguided administrative discretion. On the contrary, in *Am. Power & Light*, there was "'a veritable code of rules' set out in other sections of the statute[,] [which] clarified the ambiguities inherent in the phrases 'unduly or

unnecessarily complicate[d]' and 'unfairly or inequitably distribute[d]' such that courts would have no trouble testing SEC's policies against the law." *Consumers' Rsch.*, 109 F.4th at 765. By contrast, the Commission's unbounded interpretation of its power to make rules "in the public interest or for the protection of investors" provides no way to "ascertain whether the will of Congress has been obeyed[.]" *Mistretta*, 488 U.S. at 379.[15]

All of the examples the Defendants offer of statutes that have been upheld against nondelegation challenges are distinguishable on the same or similar grounds. For example, in *Mistretta*, Congress provided requisite direction to guide the Sentencing Commission because the statutory text required the Commission to consider seven factors that made clear the sort of considerations that Congress intended to govern the Commission's discretion. *Id.* at 374–78. By contrast, there is nothing in the Securities Act or Exchange Act even loosely limiting

---

[15] Likewise, *Gundy v. United States* rejected a nondelegation argument because "[t]he text, considered alongside its context, purpose and history, [made] clear that the Attorney General's discretion" was limited to "considering and addressing feasibility issues." 588 U.S. 128, 136 (2019). As the majority emphasized, the "nondelegation inquiry always begins (and often almost ends) with statutory interpretation." *Id.* at 135.

administrative discretion under the Defendants' freewheeling interpretation.[16]

The Defendants' point to *Bhatti v. Fed. Hous. Fin. Agency*, 15 F.4th 848 (8th Cir. 2021), as an example of this Court upholding a broad delegation. But *Bhatti* demonstrates only that a nondelegation challenge fails when the statutory text provides "clear and recognizable instructions." *Id.* at 854. In that case, the text of the Housing and Economic Recovery Act directed the Federal Housing Finance Agency to act as a conservator, with clear instructions to take actions as needed to "to put the regulated entity in a sound and solvent condition," and to "conserve [its] assets and property." *Id.* But under the Defendants' open-

---

[16] Defendants also cite *Yakus v. United States*, 321 U.S. 414 (1944). But *Yakus* is irrelevant because it concerned a delegation "of 'war' powers." *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. OSHA*, 938 F.2d 1310, 1318 (D.C. Cir. 1991). In any event, Congress gave objective direction guiding administrative discretion in that case. The Executive was charged with fixing "fair and equitable" prices for commodities during World War II. *Yakus*, 321 U.S. at 420. And the text gave direction in specifying that when setting price controls the Executive had to look to "prevailing prices during the designated [pre-war] base period" and make "adjustments to compensate for enumerated disturbing factors . . . ." *Id.* at 423.

ended interpretation of its authority, there are no "clear and recognizable instructions." *Id.*

The Defendants also analogize this case to *Whitman v. American Trucking Association,* 531 U.S. 457, 473 (2001), where the Supreme Court upheld a delegation authorizing the Environmental Protection Agency to make rules "requisite" to protect the public health. But this was not a delegation of unfettered discretionary power. The text made clear that the EPA was guided by an objective requirement that it had to make rules based on "the latest scientific knowledge[.]" *Id.* at 473.

Nor do the cases the Defendants cite in the securities context help. They cite *American Sumatra Tobacco Corporation v. SEC*, 110 F.2d 117, 121 (D.C. Cir. 1940), in which the D.C. Circuit rejected a nondelegation challenge. But in that case, the Court understood the term "public interest" as entailing a limiting principle because the Act was geared toward "mak[ing] disclosures in order to forestall unfair practices in the sale of securities and for the protection of investors." *Id.* at 121. Put simply, the financial context of the statute was an obvious limit on the Commission's authority. But now the Commission rejects this limiting

principle in claiming power to compel disclosures on financially irrelevant information.

Likewise, *Wright v. SEC*, 112 F.2d 89 (2d Cir. 1940), is unavailing. In that case the Second Circuit rejected a nondelegation challenge targeted at the Commission's authority to make rules "for the protection of investors." *Id.* at 94–95. The Court concluded that this was a "sufficiently definite criterion to guide the Commission" because the Commission was charged with protecting investors against harms that would threaten their financial interests. *Id.* So, in that context, the Court had little trouble upholding the Commission's decision to revoke a license from a broker who had been found guilty of unlawful conduct on a national securities exchange. *Id.* By contrast, the Commission has created a nondelegation problem in rejecting the traditional financially focused understanding of its authority; instead, the Commission now asserts policymaking discretion to decide for itself what investors need protection from.

And for similar reasons, the Department's reliance on *South Dakota* is misplaced. In that case, this Court held that the Indian Reorganization Act entailed an intelligible principle because "[t]he [statutory]

language . . . provide[d] guidance." 423 F.3d at 797. While the delegated authority was broad, the text nonetheless imposed "adequate limits" on the Secretary of Interior's discretion to acquire land because those land acquisitions had to be "for [the use of] Indians," and because the statute imposed "[a] limitation on authorized funds . . . ." *Id.* Additionally, the Court reasoned that the historical context—as illuminated by legislative history—made clear the limited purpose for which those funds could be used. *Id.* at 797. But here, an appeal to history only confirms that Congress intended only financially relevant disclosures—which cuts against the Commission's statutory interpretation. *See* SEC Br. at 32 (acknowledging that the legislative history speaks to Congress' goal of "provid[ing] investors with 'important information' to promote 'the operation of the markets as indices of real value.'"). And, again, if the Commission's authority is unmoored from that financial context, there is no longer any limiting principle.

Finally, there is no limiting principle even to the extent that the Climate Rule is justified as compelling what the Commission has *deemed* financially relevant information. *See Whitman*, 531 U.S. at 473 (explaining that if a statute empowers an agency with the "choice of

which portion of the power to exercise" that "would *itself* be an exercise of the forbidden legislative authority."). If the Commission's capacious authority to make rules "in the public interest or for the protection of investors" allows the Commission to stretch the very concept of financial relevance (i.e., to decide for itself what investors need protection from), then there is no limiting principle. At that point, the Commission might require disclosure of anything no matter how attenuated the connection to finance. *See* Intervenors Br. at 16 (asserting "the broadest [possible] content in the [Act's] grant of regulatory and administrative power.") (quoting *Dyer v. SEC*, 287 F.2d 773, 779 (8th Cir. 1961)). This would mean the Commission's disclosure rulemaking authority would be coextensive with Congress' power to *make law* requiring disclosures as it deems appropriate.

For example, the Commission could require disclosure of whether board members or corporate officers eat their vegetables, whether they work out, and what time they go to sleep. Those issues could conceivably affect company profit margins in a ***hyper-attenuated*** manner. After all, diet, exercise, and sleep affect health. And healthy board members *might* make better choices. But such an unbounded conception of financial

relevance would stretch the Commission's disclosure power to cover even the most trifling matters. *See CSX Transp., Inc. v. McBride*, 564 U.S. 685, 701 (2011) ("In a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond.") (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 41, p. 264 (5th ed. 1984).

\* \* \* \* \*

**CONCLUSION**

For the foregoing reasons, this Court should set aside and vacate the Climate Rule in its totality.

DATED: September 17, 2024.

Respectfully submitted,

LUKE A. WAKE
ADAM F. GRIFFIN
Pacific Legal Foundation

By /s/ Luke A. Wake
    LUKE A WAKE
    Pacific Legal Foundation
    555 Capitol Mall, Ste. 1290
    Sacramento, CA 95814
    Telephone: (916) 419-7111
    LWake@pacificlegal.org

    ADAM F. GRIFFIN
    Pacific Legal Foundation
    3100 Clarendon Blvd., Ste. 1000
    Arlington, VA 22201
    Telephone: (202) 888-6881
    AGriffin@pacificlegal.org

    *Counsel for Petitioners*

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

1.  This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(ii) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    **X**     this document contains 6,109 words, or

    this brief uses a monospaced typeface and contains [state the number of] lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

    **X**     this document has been prepared in a proportionally spaced typeface using **Microsoft Word for Microsoft 365 in 14 pt. Century Schoolbook**, or

    this document has been prepared in a monospaced typeface using [state name and version of word-processing program] with [state number of characters per inch and name of type style].

3.  This document has been scanned for viruses and is virus free.

    DATED: September 17, 2024.

                              By /s/ Luke A. Wake_____
                                  LUKE A. WAKE
                                  *Counsel for Petitioners*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 17, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Luke A. Wake
LUKE A. WAKE
*Counsel for Petitioners*